# J. W. McMURRY, Appellant, v. KANSAS CITY and THOMAS KELLEY & SON.

### In Banc, June 26, 1920.

1. **INTERSTATE SEWER: Legislative Power.** As far as authority can be predicated upon state and municipal legislation, Kansas City has been invested with power to establish a joint sewer district and to co-operate with public corporations in the State of Kansas for the construction of Turkey Creek Sewer and the extension of it beyond the city and state lines to the Kansas River as its outlet, and to pay for the same by special tax bills levied against the lots of land within the joint sewer district.

2. ———: **Limitations Upon Municipal Action: Judicial Notice.** The only limitations upon the right of a city in the exercise of its charter powers to establish sewer districts and provide for the construction of sewers therein are that acts or ordinances in furtherance of said powers shall not be creatures of fraud, whim or caprice, or in violation of common right, or impose a burden on the citizen or community without corresponding benefit. The courts recognize the public necessity of sewer systems for municipalities, take judicial notice that they promote the public health, elevate the moral tone of the people and encourage right living, and do not interfere with a reasonable exercise of the discretion vested in the municipality to act.

3. ———: **Joint Sewer District: Special Tax Bills.** Kansas City has charter power to establish a joint sewer district composed of 144 existing districts, embracing one-eighth of the city's area, not embracing therein any land which is not within the natural drainage area of the valley or watercourse in which the joint district sewer is to be constructed, and the City Council has the discretion to require that the entire cost of construction shall be paid by special tax bills against the lots therein.

4. ———: ———: **Benefit: Legislative Matter.** The question of whether the lots in a joint sewer district will or will not be benefited by the construction of a sewer is a legislative and not a judicial question; and the municipal legislature having determined that they would be benefited, and fixed the ratio of such benefit, and there being no question of fraud or oppression in the enactment of the ordinance, and the proceedings being regular and in conformity with the charter, its determination is conclusive.

5. ———: **Outlet in Another State.** An outlet to a sewer is necessary, and where the legislatures of two adjoining states authorize it, the city may provide for its outlet outside of its corporate limits and extend the sewer beyond the state line into the other state,

and provide for the emptying of the sewage into a river in that state.

6. ———: **Drainage of Area of Another State: Dominant and Servient Estate.** The ordinance provides for a joint sewer district of 4762 acres situate in Kansas City and in the watershed of Turkey Creek, and for the construction of a joint district sewer of sufficient size to receive the entire volume of water carried by this stream in flood time. Adjacent to the proposed district and across the state line in Kansas is the City of Rosedale, which is afforded drainage in part by the natural channel of said stream, which has its source in Kansas; and if the channel is destroyed, as is contemplated by the construction of the proposed sewer, that city will be deprived of any means of disposing of its sewage. To meet the situation, the plan of construction provides for inlets to the joint district sewer for the drainage of an area of 250 acres in Rosedale, and it is contended that the increased capacity of the sewer, made necessary by providing drainage for said Rosedal area, is unauthorized. *Held*, that the Rosedale area is the dominant estate, and the Kansas City area drained by the creek is the servient estate, and it is elementary that the servient owners must suffer the consequences of the unrestricted flow of drainage onto their lands from the dominant estate, and the enlargement of the sewer so as to provide for inlets which drain said dominant estate is authorized.

7. ———: **Pumping Stations: Implied Power.** The cost of pumping stations, necessary to force the sewage and water from the low-level sewers into the main pressure sewer, in times of high water in the river into which it has its outlet, thereby preventing the water from backing up into basements of buildings, etc., may be assessed against the lots in the joint sewer district as a part of the cost of the sewer, under the provision of the charter which provides that "the city may construct and maintain sewers, drains and all works necessary for the disposition of sewage and garbage." While the charter does not expressly mention pumping stations, their necessity being conceded, the power is necessarily implied from those thus expressly given.

8. ———: ———: **Part of Sewer.** Necessary outlets, pumping stations, local laterals, extensions and connections are as much a part of a sewer system as manholes, catch basins and other appliances, and can be paid for in the same way as other portions of the sewer.

9. ———: **Laterals in Lowlands.** Although the low lands in the valley are already equipped with sufficient lateral sewers discharging into the creek, if in the construction of a main pressure sewer to carry the entire volume of water of the creek and watershed the usefulness of many of them will be destroyed and they must be

reconstructed so that when the water is high in the river it cannot flood basements and the low lands, they are no longer local lateral or district sewers, but a part of the entire system being installed, and made necessary by the changed conditions, and should be paid for in the same way as the main sewer, by the issuing of special tax bills upon the lots of the district; to compel the low lands to pay the entire cost of their construction and extensions, would result in the imposition of unequal burdens upon them.

Appeal from Jackson Circuit Court.—*Hon. C. A. Burney,* Judge.

AFFIRMED.

*Clarence S. Palmer* for appellant.

(1) The Kansas City Charter does not authorize the construction of any part of a joint district sewer outside the limits of the joint sewer district. The proposed outlet of the sewer in this case, of the estimated cost of $347,500, is located outside of the joint sewer district, outside the limits of the city, and outside the limits of the State. Sec. 8, Art. 8, Charter; City of Fort Scott v. Kaufman, 44 Kan. 137; Rector v. Board of Improvements, 50 Ark. 116; Deyo v. City of Newburg, 122 N. Y. Supp. 835. (2) The sewer provides for receiving drainage from the City of Rosedale in the State of Kansas. It is submitted that the power of special assessment does not authorize the construction of sewers for that purpose and charging the cost of the same against the land within the joint sewer district. Boyder v. Brattleboro, 65 Vt. 504; Park Ave. Sewers, Appeal of Parker, 169 Pa. St. 433. (3) There is no authority in the Kansas City Charter for the construction of pumping stations and the payments of the cost thereof by special assessment. (4) The construction of laterals so great in number and extent, provided for herein at an expense of nearly $400,000, is unauthorized as par t of the joint district sewer. Such appurtenances properly belong to a

district sewer. Sec. 7, Art. 8, Charter. (5) The sewer is of such magnitude and character that it is unreasonable that it should be constructed as a joint district sewer. Benefits, obviously, differ greatly in different parts of the district and the assessment of the whole cost at a uniform rate per square foot renders the ordinance unreasonable and, therefore, invalid. State ex rel. v. Wilder, 217 Mo. 261; Hill v. Swingley, 159 Mo. 49; Blue v. Wentz, 54 Ohio St. 254; Commerce Trust Co. v. Blakely, 274 Mo. 52; Schwabe v. Moore, 172 S. W. 1157.

*E. W. Harber,* City Counselor, and *Burr N. Mosman* and *J. C. Petherbridge,* Assistant City Counselors, for respondent; *M. A. Fyke* of counsel.

(1) Kansas City has express power, under its charter to construct and maintain sewers, drains and all works necessary for the disposition of sewage; to declare the class to which the sewer belongs, and to provide for the manner of payment for each class. Sec. 1, Art. 1, p. 96, Charter; Heman v. Allen, 156 Mo. 534; Idem, 181 U. S. 402; Heman v. Schulte, 166 Mo. 409; Secs. 5, 6, 7, 8, Art. 8, pp. 323-326, Charter, (2) Kansas City has express power, under its charter, to create and establish joint sewer districts and to construct therein joint district sewers and to pay for the same by issuing special tax bills on the lands in such district. Sec. 8, Art. 8, Charter, p. 326; South Highland Land & Imp. Co. v. Kansas City, 172 Mo. 523; Prior v. Const. Co., 170 Mo. 450. (3) Whether or not the property of appellant and all of the property in the joint sewer district will be benefited by the construction of the proposed improvement, is a legislative and not a judicial question; the municipal legislature adjudged that all such property would be benefited thereby when it established the joint sewer district for this improvement; there being no fraud or oppression of the municipal legislature in passing the ordinances (and none is charged), such judgment of the municipal legislature is conclusive. Prior v. Const. Co.,

170 Mo. 451; Heman v. Allen, 156 Mo. 534; Shumate v. Heman, 181 U. S. 402; Heman v. Schulte, 166 Mo. 409; Barber Asphalt Co. v. French, 158 Mo. 534; Idem, 181 U. S. 324; Johnson v. Duer, 115 Mo. 366; McGhee v. Walsh, 249 Mo. 283. (4) Appellant concedes the regularity of the proceedings up to and including the confirmation of the contract to do the work, and that they were in conformity with the Kansas City Charter relating to such matters. If they were in conformity with the charter, then they are valid and conclusive against appellant. Land & Imp. Co. v. St. Louis, 257 Mo. 301; McGhee v. Walsh, 249 Mo. 284. (5) Kansas City having the power to construct sewers, has also the power, expressed and implied, to construct an outlet to a sewer, although such outlet lies outside of the city limits and outside of the state, and to pay for the same as a necessary part of the cost of the sewer, by issuing special tax bills therefor upon the joint sewer district created and established for the purpose of constructing therein such sewer and its outlet. Sec. 1, Art. 1, p. 96, Charter; Par. 13, sec. 1, art. 3, p. 145, Charter; Sec. 10, art. 8, Charter; Sec. 25, art. 6, Charter; Laws 1911, pp. 334-335; Amendment to Charter, 1913; Hall v. Sedalia, 232 Mo. 355; Schueler v. Kirkwood, 191 Mo. App. 575; Land & Imp. Co. v. Kansas City, 172 Mo. 523; Page & Jones on Taxation by Assessment, pp. 507-8, secs. 329, 330; Page & Jones on Taxation by Assessment, p. 1085, sec. 636; 5 McQuillin, Mun. Corp. secs. 2037, 1434; 2 Dillon, Mun. Corp. (5 Ed.), sec. 776; 3 Dillon Mun. Corp. secs. 1148, 1028, and notes; Land & Imp. Co. v. City of Billings, 111 Fed. 976; Kraft v. Smothers, 103 Ark. 269; City of Coldwater v. Tucker, 36 Mich. 476; Maywood Co. v. Village of Maywood, 140 Ill. 216; Briggs v. Union Drainage Dist., 140 Ill. 53; Albertson v. Town of Chicago, 120 Ill. 226; Gage v. Chicago, 191 Ill. 210; Church v. People ex rel., 179 Ill. 205; Johnson v. Duer, 115 Mo. 377. (6) Kansas City has all the necessary implied powers to fully carry out and effectuate its express powers; having the express power to construct sewers, it has all the necessary implied

power to construct outlets therefor, sewer pumping stations, laterals, connections and extensions, and all appliances and accessories necessary to make the sewer effective and usable and perform the function for which it was designed and planned. State ex rel. v. Wilder, 200 Mo. 105; Nevada to use v. Eddy, 123 Mo. 557-8; St. Louis v. Bell Tel. Co., 96 Mo. 628; Sedalia Gas Light Co. v. Mercer, 48 Mo. App. 651; Knapp v. Kansas City, 48 Mo. App. 492; Plattsburg v. Trimble, 46 Mo. App. 459; Water Co. v. Aurora, 129 Mo. 575; State v. Railroad, 75 Mo. 210; Springfield v. Weaver, 137 Mo. 667; State v. Butler, 178 Mo. 313; St. Louis v. Klaime, 180 Mo. 321; Chillicothe ex rel. v. Henry, 136 Mo. App. 474; Hayes v. Poplar Bluff, 263 Mo. 531; Hill v. Union E. L. & P. Co., 260 Mo. 73; Chambers v. St. Louis, 29 Mo. 543; Hafner v. St. Louis, 161 Mo. 34; Sasse v. Barkwell, 195 S. W. (Mo. App.) 542; Haussler v. St. Louis, 205 Mo. 656; 4 McQuillin, Mun. Corp., pp. 3035, 3036, 3080, 3084; Cunningham v. Ponca, 27 Okla. 853; Schueler v. City of Kirkwood, 191 Mo. 586. (7) The lands in Missouri are the servient estate, the lands in Rosedale, are the dominant estate; the servient owners must suffer the consequences of drainage flowing unrestrained on to their lands from the lands of the dominant owner. Land & Imp. Co. v. St. Louis, 257 Mo. 301. (8) The pumping stations, being a necessary and indispensable part of the sewer, can be paid for as a part of the cost of the sewer in the same manner as the sewer is paid for. McChesney v. Village of Hyde Park, 151 Ill. 634; Schueler v. City of Kirkwood, 191 Mo. App. 575; Fischer v. Chicago, 213 Ill. 268; Hall v. Sedalia, 232 Mo. 355; Northwestern University v. Wilmette, 230 Ill. 80; 5 McQuillin, Mun. Corp. sec. 2037, p. 4370; Page & Jones, Taxation by Assessment, sec. 330. (9) Since the laterals are a necessary part of the sewer system so devised and planned, they can be paid for in the same way by special tax bills issued upon the district established for that purpose. Page & Jones on Taxation by Assessment, p. 509, secs. 330, 331; Prior v. Construction Co., 170 Mo. 450; 5 McQuillin, Mun. Corp.

sec. 2037, p. 4370; Heman v. Lyon, 277 Mo. 640; Schlap-fer v. Town of Union, 53 N. J. L. 68. (10) It is within the power of Kansas City, under its charter, to provide for and construct this sewer as a joint district sewer, and cause it to be paid for in special tax bills on the district, irrespective of its size or cost. Whether the sewer could have been paid for in some other manner is immaterial and does not lessen nor deprive the city of its power to pay for it in the manner proposed by issuing special tax bills upon the joint sewer district created for that purpose. Sec. 5, art. 8, p. 323, Charter; Sec. 8, art. 8, Charter; Land & Imp. Co. v. Kansas City, 172 Mo. 523; Prior v. Const. Co., 170 Mo. 439; Kansas City v. Richards, 34 Mo. App. 521; Heman v. Allen, 156 Mo. 545; Moberly v. Hogan, 131 Mo. 19; Hill v. Swingley, 159 Mo. 45; Mc-Ghee v. Walsh, 249 Mo. 266.

WALKER, C. J.—Appellant brought this suit in the Circuit Court of Jackson County to enjoin respondents from constructing a joint district sewer in Kansas City, Missouri, the outlet or termination of which was to be in the State of Kansas. Appellant is a property owner in the joint sewer district whose land would be subject to assessment for its proportionate part of the cost of the work. The contract for same has been awarded by said city to the other respondent.

Upon a hearing in the Circuit Court of Jackson County on the 1st day of April, 1920, there was a finding for defendants denying the application for an injunction, from which an appeal has been perfected to this court.

The contemplated joint district sewer is designed to receive the entire volume of the water carried by a stream designated as Turkey Creek, which now affords surface drainage to a large area of said city, and to divert this water into the proposed sewer.

The purpose sought to be accomplished is the prevention in the future of overflows after freshets, from which this section of Kansas City has heretofore suffered; the more complete removal of the sewage from that part of

Kansas City drained by the proposed joint district sewer and its laterals and feeders; and the improvement of sanitary conditions, which it is stated will result therefrom.

There is no dispute about the facts, the case having been submitted to the trial court upon an agreed statement of same. That the condition existing should be met by the city is not questioned; no contention is made that the plan proposed and embodied in the contract is not practicable; and the salutary effect which will result from an improvement of present conditions is conceded. The sole contention is that Kansas City is attempting in this matter to exceed its charter powers.

It is contended: First, that, under the charter providing for the construction of joint sewer districts( Sec. 8, Art. VIII) there is no authority to construct any part of a joint district sewer outside the limits of the city. In this case the outlet for a distance of 447 feet, at an estimated cost of $347,500, is to be constructed not only beyond the city limits, but outside the State of Missouri. Second, that the sewer provides drainage facilities for about 250 acres of land in the city of Rosedale in the State of Kansas, and that the burden of caring for this drainage should not be assessed against the owners of land in the joint sewer district in Kansas City, Missouri. Third, that there is no authority in the charter to construct sewer pumping stations for the purpose of operating the sewer in times of high water by mechanical means. Fourth, that lateral sewers of the extent herein provided for are necessary appurtenances to joint district sewers, and that the districts in which the former are located should bear their proportionate share of the cost of the latter, instead of assessing said cost against the property alone within the joint sewer district. Fifth, that the sewer is of such magnitude and character, and its cost so great, that it should not be constructed as a joint district sewer, but should be paid for out of the general city revenue or by the proceeds of bonds issued by the city.

I.   The powers granted to Kansas City under its charter, adopted in 1908, pertinent to the matter at issue, are as follows: "To construct and maintain sewers, drains and all works necessary for the disposition of sewage." [Sec. 1, Art. I, p. 96.]

*Legislative Authority.*

"To divide the general sewer system of the city into four classes, to-wit: public, district, joint district and private sewers.   The city may, by ordinance, find and determine the class to which any sewer belongs, and the finding and determination of the city in that respect shall be final and conclusive." [Sec. 5, Art, VIII, p. 323.]

"To pay for public sewers out of the general fund of the city." [Sec. 6, Art. VIII, p. 325.]

"To construct districts sewers and pay for same by special tax bills issued upon the district created for that purpose." [Sec. 7, Art. VIII, p. 325.]

"To create and establish joint sewer districts for the purpose of constructing therein joint district sewers, and provide for the payment for the construction of same in special tax bills issued upon the joint district, or partly in cash and partly in special tax bills, as determined by ordinance of the Common Council." [Sec. 8, Art. VIII, p. 326.]

The power conferred on the city to construct and maintain sewers, drains and all works necessary for the disposition of sewage appears in Section 1 of Article I of the charter before quoted.   A subsequent provision of the charter, which is a necessary supplement of the power to construct and maintain sewers and without which the latter could not be rendered practically effective, authorizes the Common Council to establish, erect and keep in repair . . . . sewers, sewer outlets within or without the corporate limits of the city.   [Par. 13, Sec. 1, Art. II, p. 145, Charter.]   This power is further and more definitely defined in relation to the construction and manner of payment therefor of outlets for joint district

in Section 10, Article VIII, p. 327, of the charter, as follows:

"Whenever the city shall deem it necessary, it may, by ordinance, provide for the construction within or without the limits of the city, of septic tanks or other sewer reduction devices, for the purpose of purifying the discharge from public, district or joint district sewers, or outlet thereof; the cost of such septic sewer tanks or devices may be paid for in part or in whole out of the general fund, or in case of a district or joint district sewer, or outlet therefor, in part or in whole, in special tax bills, as a part of the cost of constructing or extending the district or joint district sewer, or outlet therefor, as may be designated by ordinance providing therefor."

Further authority for constructing outlets for sewers outside of the city limits, and paying for the same in the manner there proposed, is found in Section 25 of Article VI of the charter. That section provides for the acquisition of lands outside of the corporate limits as may be required for a right of way for any such outlet sewers, and further provides, among other things, that the cost of constructing such outlets and all appurtenances may be paid for in special tax bills against the lands embraced within the district deemed to be benefited.

That portion of the section relating to the cost of such outlets is as follows:

"The cost of constructing such outlet and all appurtenances which may be constructed in connection with such outlets, less such sum as may be appropriated by the city for that purpose or otherwise paid, shall be paid for in special tax bills, as hereinafter provided, against all lands, exclusive of highways, streets and alleys embraced within the said district or districts."    [P. 285, Charter.]

Section 35 of Article VI, p. 289, of the charter, further provides for the cost of outlet sewers, as follows:

"The cost of constructing any outlet sewer, appurtenances and works in connection therewith or to be

used in connection therewith on or along said right of way course or drainage or watercourse or on said land or any part thereof, less such sum as may have been appropriated by the city for that purpose or otherwise paid as aforesaid, shall be paid for wholly or in part in special tax bills against all lands embraced within said district or districts, exclusive of public highways, streets and alleys, in proportion to the area of each tract, the work to be done and the special tax bills to be issued in accordance with the provisions of this charter concerning the construction of district sewers and the issuing of special tax bills therefor so far as the same may be applicable.''

In addition to the foregoing, the Legislature of this State in 1911 (Laws 1911, p. 334) passed a general enabling act by which cities of the class to which Kansas City belongs are empowered to ''contract with drainage districts or with other public corporations in this or any adjoining state for co-operation or joint action in building sanitary and storm sewers in watersheds extending into the territorial limits of all districts, or corporations so co-operating, and in constructing levees along the banks of, or shortening, diverting or otherwise improving any natural watercourse to prevent its overflow, where the same overflow is likely to cause injury or damage to lands situated within the territorial limits of all the districts or corporations so co-operating.''

Other sections of this act peculiarly appropriate to the discussion of the issues here involved, more comprehensively declare the extent of the power conferred and provide the manner in which the improvement thus authorized shall be paid for. These sections are as follows:

''Sec. 2. Where a watershed located partly within any such city and partly within an adjoining state requires, for the health, safety and comfort of the inhabitants of such city, the construction of sewers and protection against flood, such city may, with consent of such

adjoining state, but with or without the co-operation of
public corporations of such adjoining state, build sani-
tary or storm sewers, construct levees along the banks of,
or shorten, divert or otherwise improve any natural
watercourse in such watershed. Such city may, by pur-
chase or eminent domain proceedings, acquire rights of
way for any such sewers or improvements of water-
courses.

"Sec. 3. Such city shall have power to pay for all
such work and rights of way herein provided for in part
or in whole out of the general funds, or by the imposition
of special assessment upon lands located in such city
and within the district deemed to be benefited by the
construction of such sewers or such levees, or the shorten-
ing, diversion or improvement of such watercourse.

"Sec. 4. Any such city is hereby given power by its
charter or amendment thereto to determine the manner,
method and distribution of the cost of the work and
rights of way to be paid for in special assessments and
to establish thereby the procedure in such cases and the
form of obligation to be issued."

In 1911 the Legislature of the State of Kansas
(Laws, Kan. 1911, p. 303) passed an act authorizing
municipalities of other states "to contract with drain-
age districts and other public corporations of this state
for the building and maintenance of sewers, dikes and
levees and for the diverting and improving of water-
courses in watersheds extending into the territorial lim-
its of such municipalities, drainage districts and
public corporations and prescribing the conditions up-
on which such contracts shall take effect, and providing
a method of commencing suits against such foreign
municipalities."

In harmony with these state and municipal enabling
acts and to render it possible more plenary the power
conferred upon the city to make this improvement, the
people of Kansas City, in January, 1913, adopted an
amendment to Article XII of the charter by adding
thereto sections numbered respectively 28, 29 and 30,

having particular reference to sewers and drainage. Section 28 adds to the power of the city then possessed to co-operate with other cities and states in the diversion of Turkey Creek and the building of sewers to afford protection against floods in the Turkey Creek valley and the West Bottoms of Kansas City or to make this improvement alone. Section 29 confers specific authority upon the city, among other things, to build this projected outlet and other works outside of the State. Section 30 provides for the payment of the cost of any or all such improvements, including the pumping stations, and the extension of the sewer outside of the city and outside of the State, by special assessments therefor upon the property located within the city and within the district deemed to be benefited by such improvements.

A subsequent section provides that powers granted by the foregoing amendments ''shall be deemed cumulative in character and shall not revoke or restrict but shall enlarge the powers heretofore possessed by the city.''

From all of which it appears, so far as authority can be predicated upon state and municipal legislation, that Kansas City has been panoplied with ample power to define the joint sewer district and as well to construct and maintain the proposed sewer therein and the outlet thereof and to pay for same in special tax bills to be assessed and levied upon the lands within said joint sewer district as the boundaries of the latter have been by ordinance defined by the Common Council of said city in establishing such district. The only limitation imposed upon the Common Council in the creation of the district being that no land not within the drainage area shall be including therein. It is conceded that only lands within such area are included. Among other things, the ordinance numbered 38847, approved May 22, 1919, establishing this district for the purpose of constructing therein the Turkey Creek sewer, provides:

''That said sewer districts are hereby united into a joint sewer district for the purpose of constructing and paying for a joint district sewer therein, to be

known as 'The Turkey Creek Sewer,' and various laterals and tributary sewers thereto, an extension of the main sewer from the Missouri-Kansas state line into the Kansas River as an outlet of said sewers," etc., etc.

"All of which are necessary parts of the main Turkey Creek Joint District Sewer and essential for a full, complete and successful operation thereof, and the Common Council deems that such Joint District Sewer, with its laterals and tributaries, the outlet therefor, the connections with existing sewers and the pumping stations, the necessary appurtenances thereto and appliances therefor, including the accessories above mentioned, are all necessary in order to successfully sewer and drain said joint sewer district, and should be paid for in special tax bills, made, levied, assessed and issued upon and against the lots of land within said joint sewer district, in the manner provided therefor in the Charter of Kansas City, Missouri, relating to the construction of joint district sewers and outlets therefor."

Included within the boundaries of this joint sewer district there are 144 sewer districts, comprising about 4762 acres of land. The sewage from said 144 districts now draining into Turkey Creek will, upon the completion of this improvement, drain into the proposed joint district sewer.

II. The power here sought to be exercised having been shown to be authorized by legislation, it remains to be determined whether the acts and ordinances declaratory of this power are in contravention of any rule of construction the application of which is necessary to their validity.

Judicial Approval.

First, as to the recognition by the courts of acts and ordinances authorizing an improvement of the character of that at bar.

The only limitations upon the right of a city in the exercise of its charter powers to establish sewer districts and provide for the construction of sewers therein are that acts or ordinances in furtherance of such

power shall not be the creatures of fraud, whim or ca-
price, or in violation of common right, or impose a bur-
den on the citizen or the community without any cor-
responding benefit. Absent these limitations and the
courts with uniformity recognize the public necessity
of sewer systems for municipalities and are loth to in-
terfere with the exercise of their power in that behalf.
Even the superficial student of civic-conditions knows
that the freedom of modern cities from plagues which
in other centuries decimated centers of population, is
due more to the present system of sewers than to any
other single cause. Moreover, health is a primary pos-
tulate to right living and the maxim of *mens sana in cor-
pore sano* is not a mere phrase, but is worthy to be rank-
ed as a proverb. The wisdom of the Talmud is but fur-
ther attested by the trite but terse truth that cleanliness
is next to godliness; and was it not my Lord Verulam
who sententiously said that "cleanness of body was ever
deemed to proceed from a due reverence to God." It
is evident, therefore, that the end to be attained in an
improvement of the character here under review,
whether or not it be presently recognized, is not limited to
the promotion and preservation of the health of the
people of a city, but has a wider and deeper effect in
elevating their moral tone and thereby encouraging
right living.

The courts, conscious of these facts, of which they
cannot but take judicial notice, have, as is evident from
their rulings striven, without unduly straining municipal
power, to sustain and encourage plans for the construc-
tion of sewer systems. In so doing the end sought to be
effected is classified as of like public importance with
that of the building and lighting of streets, the establish-
ment and maintenance of a means for supplying water
and the removal of garbage. The conclusion, therefore,
reasonably deducible from the foregoing is that munici-
palities in the exercise of their powers in such matters
of public importance as we have indicated, are, in ad-
dition to the mere power to act, vested with a discre-
tion not subject to review by the courts unless it is af-

firmatively shown to have been exercised arbitrarily, fraudulently or oppressively. Confirmatory of this conclusion are the following cases: Heman Const. Co. v. Lyon, 277 Mo. 628, 211 S. W. 1. c. 72; St. Louis v. United Rys. Co., 263 Mo. 1. c. 455, 174 S. W. 78; Prendergast Const. Co. v. Goldsmith, 273 Mo. 1. c. 191, 201 S. W. 354; State ex rel. K. C. v. K. C. Term. Ry. Co., 260. Mo. 1. c. 493, 168 S. W. 1144.

III. The city's right to construct a sewer established, a pertinent inquiry, prompted by this conclusion and necessary to the determination of the matter

Joint Sewer District. at issue, is its right to create and establish a joint sewer district, to construct therein a joint district sewer and to provide for the payment of same by issuing special tax bills on the land in the district. A section of the city charter heretofore referred to satisfatorily answers this inquiry in the affirmative unless it be found subject to the limitations we have stated as inimical to the validity of enactments of this character. This section is as follows:

"Whenever the city may deem it necessary that a sewer should be constructed or reconstructed in any part of the city containing two or more sewer districts, it may, by ordinance, unite such sewer districts into a joint sewer district and cause a sewer to be constructed therein in like manner in all respects as is provided in section seven of this article in cases of district sewers, except in cases of joint district sewers the city may, if deemed proper, provide in the ordinance creating such joint district sewer that the city shall pay a certain sum, to be specified in said ordinance, toward the payment of the cost of such joint district sewer; and should the Common Council, by ordinance, unite two or more sewer districts into a joint sewer district for the purpose of constructing the joint district sewer therein, the action of the Common Council shall be conclusive for all purposes and no special tax bills shall be held invalid or be affected on account of the included drainage area thereof, or the size, character or purpose of such sewer;

Provided, however, that no sewer district shall be included in such joint district which is not included in the natural drainage area of the valley or water course in which the joint district sewer is proposed to be constructed. The contract for the construction of such sewer shall specify that the city shall be liable for the sum so specified to be paid by the city, and that the remainder of the cost thereof shall be paid in special tax bills to be issued in any manner that is or may be provided for the issuing of tax bills for the construction of sewers." [Sec. 8, Art. VIII, p. 326, Charter.]

The joint sewer district created in this case does not contain any land which is not within the natural drainage area of the valley or of the natural water-course discharging into this sewer. In providing for the construction of this sewer and its equipment to take care of the sewage and drainage of the area included within this joint sewer district, the Common Council took into consideration, among other things, the fact that it drained and benefited directly only about one-eighth of the entire area of the city, and hence determined, by ordinance establishing the district, to make this a joint district sewer and not a public sewer, and to pay for it by issuing special tax bills upon the district so created. The resolution of the Board of Public Works, proposing the improvement, the contract and the ordinance confirming the contract, all provide for the payment of this sewer and its equipment by issuing special tax bills upon the joint sewer district.

The whole matter was one involving the exercise of the discretion of the Common Council, and its determination to construct the sewer and pay for it in the manner proposed, in the absence of fraud or abuse of discretion, is not, as we have shown, subject to review by this court.

In Land & Imp. Co. v. Kansas City, 172 Mo. 523, we construed the power given to Kansas City to create a joint sewer district embodying and combining a great number of sewer districts therein for the purpose of constructing a joint district sewer, and determined that

question in favor of the city. That case, decided in 1903, was very similar to the one here, in which it was sought to join 105 sewer districts containing about one-fourth of the then area of the city into a joint sewer district for the purpose of constructing therein a large joint district sewer. In that case, as here, an injunction suit was instituted to prevent the city from constructing the sewer upon the ground that it did not have the power to join all the districts into such a joint district sewer because within the district thus created many district sewers had been constructed and paid for by each district and that the districts were already sewered; and for the further reason, as here, that because of the size and cost of the sewer it should be paid for as a public sewer out of the general funds of the city. The court denied all of these contentions and held that the sewer was not a public sewer as defined by the charter; that the city had the power to unite the 105 districts or any other number into a joint sewer district for the purpose of constructing a joint district sewer therein and to pay for the same by issuing special tax bills upon the joint district thus formed.

In Prior v. Construction Co., 170 Mo. 439, the question arose in St. Louis, the charter of which is similar in the matter at issue to that of Kansas City, as to whether the city had the power to declare the sewer under consideration a joint district sewer and pay for it by issuing special tax bills upon the district. This court held, among other things, that the people of St. Louis had the right in adopting their charter to provide for the different kinds of sewers and determine the class to which they belong and the manner of paying for each. The court's language in thus ruling is as follows:

"The people of St. Louis had the power to so amend their charter as to provide for public, district, joint district and private sewers, instead of public and district sewers only as formerly. They also had the power to require that any or all sewers of whatever kind should be paid for out of the public revenues or by special assessments against the property benefited thereby.

"A sewer created by an ordinance uniting more than one district and providing a main outlet or intercepting sewer for the joint benefit of such districts, to be paid for by special taxes assessed upon all property in a joint sewer district, is a joint district sewer, within the meaning of charter provisions which define a joint district sewer to be a sewer constructed or acquired under the authority of ordinances, uniting one or more districts or unorganized territory, for the purpose of providing main ʹoutlet or intersecting sewers, for the joint benefit of such districts or territory, to be paid for by special taxes assessed against all property in said joint sewer district. And such sewer is none the less a joint district sewer because the purpose of its construction is to supplement an inadequate sewer which under the old charter was a public sewer constructed out of public revenues" (p. 449).

A like power to that above defined has been conferred upon the poeple of Kansas City. Having such power, the Common Council, upon the recommendation of the Board of Public Works acting upon the advice of the city engineer and the engineer of sewers, determined, by ordinance, to construct this improvement as a joint district sewer and to pay for it in special tax bills upon the joint sewer district created for that purpose. The action of the Council, in the absence of fraud, in that regard, under the decisions of this court, is conclusive.

We held, in effect, in the Prior case, supra, (p. 451) that the question of whether the plaintiff's lots would or would not be benefited by the construction of a sewer is a legislative and not a judicial question, and the municial Legislature having adjudged that they would be benefited and fixed the ratio of such benefit, when it established the joint sewer district, and as there was no question of fraud or oppression of the municipal assembly in so passing such ordinance (even if such allegation would convert the question into a judicial one, as to which it is not necessary now to decide), such judgment of the assembly is conclusive.

In that case we held further that where it appeared that the officers and agents of the city acted within the purview of the powers conferred upon them by the charter in the passage of the ordinance authorizing the construction of the joint district sewer we would affirm the judgment of the trial court upholding the regularity of the proceedings.

From all of which this general conclusion, as expressly announced in Heman v. Allen, 156 Mo. l. c. 543, is authorized, "that, as a general rule, in the absence of fraud in establishing a sewer district, or in letting the contract for the sewer's construction, and in the absence of unreasonableness of the ordinances providing for the establishing and constructing of the sewers, the courts will not interfere."

Other cases of like import are as follows: Shumate v. Heman, 181 U. S. 402; Heman v. Shulte, 166 Mo. l. c. 415; French v. Barber Asp. Pav. Co., 158 Mo. l. c 547, affd. 181 U. S. l. c. 343; Johnson v. Duer, 115 Mo. l. c. 376; McGhee v. Walsh, 249 Mo. l. c. 283. In which case last cited it is held that:

"It is well settled in this State that the matter of establishing the sewer districts in a city is intrusted by the Legislature to the common council thereof, and that the act of such common council is conclusive in a collateral attack." [Citing cases.]

Further, that "it is within the power of the Legislature to create special taxing districts and to charge the cost of a local improvement, in whole or in part, upon the property in said districts, ether according to valuation or superficial area or frontage." [Citing cases.]

The regularity of the proceedings up to and including the ordinance confirming the contract to do the work, having been conceded and found upon a review of the record to be in conformity with the charter and authorized by ordinances adopted under conditions attesting their validity, may, so far as the right of the city is concerned to construct and pay for the proposed

sewer, be held to be immune from criticism and hence conclusive.

IV. Despite the power, which has been demonstrated, of the city to construct sewers and provide for the payment of same as here proposed, it is contended that an outlet for same is unauthorized because of its proposed location outside of the corporate **Power to** limits. We have set forth at some length **Provide** **Outlet.** the acts of the Legislatures of Missouri and Kansas and the charter provisions and ordinances, original and amendatory, of Kansas City declaratory of this power. The two state sovereignties having recognized same and the adjacent city in the latter state having formally consented thereto by ordinance regularly adopted, it is difficult to conceive upon what grounds appellant can base his objections to this alleged lack of power. We said in Hall v. Sedalia, 232 Mo. l. c. 355, that "a sewer system without a place to dispose of the contents would be useless;" and in Land Imp. Co. v. Kansas City, 172 Mo. 532), that "the duty of a city in respect to its sewers is not performed until it has given them an outlet." In the further discussion of this self-evident truth we said in Johnson v. Duer, 115 Mo. l. c. 377:

"The charter provides that district sewers shall connect with a public sewer, or other district sewer, or with the natural course of drainage.' The efficacy of the sewer, as a means of drainage, depends entirely on this requirement of the charter. A sewer with no proper outlet would create a nuisance, instead of improving the sanitary condition of the locality. The requirement, then, is of a substantial matter, and, if not followed by an ordinance establishing a sewer, the cost of construction could not be enforced by local assessments." [Citing cases.]

The necessity of the proposed outlet is, therefore, apparent; and the legislation authorizing same has been shown to be ample. In addition, judicial approval of legislation of this character is not lacking. In Haeus-

sler v. St. Louis, 205 Mo. l. c. 680, the City of St. Louis sought to build a bridge across the Mississippi River into the State of Illinois. It was contended that the city lacked power to construct and pay for a bridge a part of which was outside of the city limits and in another state. After demonstrating the fact that the power thus sought to be exercised had been expressly granted by State and Federal statutes and the city charter, the court said (p. 681): "The right to construct bridges over rivers and streams separating two cities or towns, by one or both of the municipalities concerned, has been recognized as a public city purpose. Nor is it any the less a city purpose because a part of the public highway is located beyond the city limits." [Hafner v. St. Louis, 161 Mo. 34; Chambers v. St. Louis, 29 Mo. 543.]

The Court of Appeals of the State of New York had under consideration in People ex rel. Murphy v. Kelly, 76 N. Y. l. c. 487, the right of the city to construct a bridge and incur a debt therefor across East River connecting it with the City of Brooklyn. After some general observations to the effect that in cases of this character each must depend upon its own facts, the court held that where the contemplated improvement was for the common and general benefit of all of the citizens it was to be regarded as within the scope of municipal government. That it could not well be held that what is meant by a city purpose is some work or expenditure within the city limits. That there could be no good reason for such a limitation. It could be no worse for a city to incur a debt for a city purpose outside of than within its corporate limits, and that there is as much reason for allowing it to be incurred in the one case as in the other.

In South St. Paul v. Lamprecht Bros., 88 Fed. l. c. 453, in which the City of South St. Paul sought to incur a debt to aid in the building of a bridge across the Mississippi River, the U. S. Circuit Court for the Eighth Circuit held: "The power to issue bonds, which was grant-

ed by Section 18 of the Act of April 23, 1891 (Spcl. Laws, Minn. 1891, p. 674), was doubtless conferred for the express purpose of enabling the city to aid in the construction of a bridge across the Mississippi River, a part of which structure would necessarily be on the opposite or east bank of the river, and outside of the city limits; and the bridge so had in view was of as great advantage to the city as it would have been if located wholly within the corporate boundaries. Ample authority is found in the act for the construction of the bridge now in question.''

In the Matter of the Application of the Mayor et al. of the City of New York, 99 N. Y. 569, the general rule was announced that an act authorizing the city to incur a debt for the purchase of lands outside of the corporate limits was not within the inhibition of the constitution against incurring a debt except for city purposes; such purpose not being limited to a work or expenditure within the city.

In Pittsburgh v. Brace Bros., 158 Pa. 174, an act of the Legislature (March 7, 1843, sec. 4) empowered the City of Pittsburg to recover water rents due and unpaid beyond the limits of the city, as well as within the same, in the same way as city taxes are now recoverable. The court, in construing the act, held that the city may furnish water to property owners outside of the municipal limits, and enforce the collection of the water rents by the entry of a lien therefor against the real estate upon which the water was furnished, according to the contract made with the customer.

In Minn. Imp. Co. v. City of Billings, 111 Fed. 972, the U. S. Circuit Court for the Ninth Circuit held a city, authorized by its charter to construct sewers and drains, and to do all other acts necessary for the promotion of health and to prevent the spread of contagious diseases within the city, has power, in constructing a general system of drainage, to extend the same to a proper outlet without the limits of the city.

In Newman v. Ashe, 9 Baxt. (Tenn.) 380, it was held that the City of Knoxville under a legislative enactment

was empowered to purchase and hold real estate outside of the corporate limits for the purpose of constructing waterworks. That while the act was not express in its terms the power was conferred by necessary implication. "The power," said the court, at page 383, "to construct waterworks—a legitimate corporate purpose —is expressly given, and the authority is given to the mayor and aldermen 'to protect from injury by adequate penalties . . . the pipes, hydrants or fixtures, buildings or improvements belonging to or in any way appertaining to said waterworks, whether within or without the limits of said corporation.' "

In view of all of which we conclude that Kansas City has the right to provide for the construction of such sewer and the outlet to same, within as well as without, its corporate limits, such improvement having been shown to be for a legitimate public purpose.

V. The City of Rosedale in the State of Kansas lies adjacent to and is now afforded drainage in part by the natural channel of Turkey Creek, which has its source in that state. If this channel be destroyed, as is contemplated by the construction of the proposed joint district sewer, Rosedale will be deprived of *Drainage of Adjacent Territory.* any means of disposing of its sewage. To obviate this condition provision is made for inlets to the joint district sewer for the drainage of the area of Rosedale now drained into Turkey Creek. This area consists, according to the agreed statement of facts, of about 250 acres. The contention, therefore, that the capacity of the sewer must be increased, for which no authority exists, to provide for the sewage from this adjacent area, does not appeal to the impartial mind with any convincing force and is not supported by any relevant or analogous facts. Aside from the basic principle sounding in justice that the power in this behalf possessed by Kansas City must be so exercised as to work no injury to others or, to put it coldly in the language of the law, leaving out of consideration for the moment any view of the situation based on a high moral sense of justice, the Rosedale

area now naturally drained by Turkey Creek constitutes the dominant estate, while the Missouri lands along which the creek runs are in the nature of a servient estate. It is elementary that the servient owners must suffer the consequences of the unrestrained flow of drainage onto their lands from those of the dominant owners. The existence of the stream, as we said in Land & Imp. Co. v. St. Louis, 257 Mo. l. c. 302, is due to the topography of the watersheds and that fact makes it the duty of the city to provide a sewer adequate to the demands created by natural conditions in the locality to be drained. Be this as it may, the record discloses—and by that is our conclusion to be determined—that the capacity of the sewer as now provided for is ample to afford complete drainage to not only the area within Kansas City but that of Rosedale. Appellant's contention, therefore, lacks any material merit.

VI. It is insisted that there is no authority for assessing the cost of pumping stations as a part of the cost of the sewer. The agreed statement of Cost of facts not only concedes the necessity of Pumping pumping stations, but with some detail states Stations. the reasons therefor. The language of same can but emphasize this conclusion. It is as follows:

"These sewer pumping stations are a necessary and essential part of the entire sewer system so designed and planned and are provided for in said resolution, contract and ordinances; the main sewer is what is known as a 'pressure sewer;' that is, in times when the water is low in the Kansas River, this and all the sewers connecting with it will flow and discharge by gravity; but at times of high water in the river it will be necessary to set the pumps in action to force the sewage and water from the low level sewers into the pressure sewers against the pressure of the high water in the Kansas River at that point. Without the pumping stations, at times of high water in the river, the water would back up from the river through the sewers into the basements of buildings, out of the manholes and flood the ad-

jacent territory, and the sewers without such pumping stations, owing to such physical conditions, would be of no value.''

The powers of a city may be tersely stated as (1) those expressly granted by its charter; or (2) those fairly and necessarily implied from those granted; or (3) those essential to the objects and purposes sought to be attained. While the Kansas City Charter does not expressly mention pumping stations, the necessity of their construction having been conceded as an essential part of this system, that portion of the charter (Sec. 1, Art. I, p. 96) which provides, ''The city may construct and maintain sewers, drains, and all works necessary for the disposition of sewage and garbage,'' may reasonably be construed to include them as a part of the ''works necessary.'' If, as the agreed statement of facts, which we cannot gainsay, discloses, as it does, that the sewer system would at times become not only inoperative but a menace to health without the pumping stations, then no cogent reason can be urged against their being made a part of this plan to be paid for in the same manner as the sewer. The reasons stated and conclusion reached for holding that there exists ample authority for the construction of the outlet applies with like force to the construction of the pumping stations under the facts applicable to this case.

In Schueler v. City of Kirkwood, 191 Mo. App. 575, where it was sought to construct and pay for a septic tank to receive the discharge from the sewers, there was no express power in the law authorizing the City of Kirkwood to build and pay for the tank by assessments upon the sewer district; but the court held that the city had implied power to build the tank as a necessary part of the sewer system of the city, in order to make it effective, notwithstanding the fact that the statute under which the City of Kirkwood was operating at that time had no express provision which authorized the installation of septic tanks. The language of the court was as follows:

"But, though such be true, it would seem that the city possessed a clear, implied power to install these septic tanks as parcel of its public sewer system. The question of power involved here relates to the public sewers, which the statute expressly authorizes the board of aldermen to construct. The ordinance provides for the septic tanks as parcel of such public sewer system and expressly declares such tanks to be a part of such system." [P. 586.]

In Sasse v. Barkwell, 195 S. W. 542, the Kansas City Court of Appeals, in a case brought to cancel certain tax bills for district sewer improvements on account of the alleged failure of the City of Brunswick to provide for the establishment of a general sewer system before the establishment of said district sewer, the court said:

"Of course, when the legislative authorities of the city, by virtue of the taxing power, attempt to create any kind of a sewer, whether public or district, it must be such as will operate and effectually dispose of the sewage. Otherwise, property might be taxed for the construction of a so-called public improvement that could in no way be used, and which would in no sense constitute a public benefit. So that the only thing in the statute which would require a 'sewer system' or a public sewer before or at the time of the creation of a sewer district, is the implied requirement, that before any such public improvement should be created, the certainty that it will be effectual and operate to dispose of the sewage must be provided for. And whenever the certainty of the final disposal of the sewage is not provided for, the prior creation of any sewer, either public or district, is unauthorized. Certainly the city would have no right to tax private property to create a public improvement when there was no assurance it would be effective or could be used for the purpose for which it was created." [P. 543.]

Therefore, if outlets, pumping stations, or local laterals, extensions and connections are necessary, as appellant concedes, to render the sewer operative and effective,

then they are as much a part of the sewer system as man-
holes and catch basins or any other appliance; and can
be paid for in the same way as the remaining portion of
the sewer.   [Hall v. Sedalia, 232 Mo. 344; McChesney
v. Hyde Park, 151 Ill. 634; Fisher v. Chicago, 213 Ill.
267; N. W. University v. Wilmette, 230 Ill. 80.]

VII.   The necessity for the construction of what are
here termed lateral sewers is rendered apparent by the
agreed statement of facts.   The portion of same
in regard thereto, briefly stated, is that, while
that part of the district in the lowlands near
the main sewer in the Turkey Creek valley is now equip-
ped with sufficient lateral sewers discharging into the
old creek bed, in the construction of the main sewer as
a pressure sewer the usefulness of many of these old
laterals will be destroyed and it will become necessary in
the construction of the new sewer to reconstruct and re-
arrange these laterals and build new ones, all of which
will connect with the sewers in the highlands, to meet
the new conditions; some of them will have to be con-
verted into pressure sewers, that is, sewers with closed
manholes, so that when the water is high in the Kansas
River it cannot escape through the manholes into the
basements of buildings and flood the lowlands.   In times
of high water in the river, they will be operated by
means of the pumps.   They are not local laterals or dis-
trict sewers, as ordinarily understood, but are a part of
the entire system being installed, made necessary by the
changed conditions in the construction of the sewer as a
pressure sewer.

Since they are a necessary part of the sewer system
and are for the benefit of the entire joint sewer district,
they should be paid for in the same way as the main
sewer, by the issuing of special tax bills upon the joint
sewer district.   It would result in an unequal imposition
of burdens to compel the people in the lowlands to pay
the entire cost of these lateral sewers and extensions,
made necessary for the reasons aforesaid, and also to

*Lateral Sewers.*

pay their proportionate share of the main sewer, when the entire district is benefited by them. [Prior v. Const. Co., 170 Mo. 439; McGhee v. Walsh, 249 Mo. 266; Heman Const. Co. v. Lyon, 277 Mo. 628; Schlapfer v. Town of Union, 53 N. J. L. l. c. 68.]

III. The right of the city to pay for the sewer and the necessary appliances to render its services effective is challenged.

Cost of Sewer.  The charter of Kansas City, among other things, provides: "The general sewer system of the city shall be divided into four classes, to-wit, public, district, joint district and private sewers. The city may, by ordinance, find and determine the class to which any sewer belongs, and the finding and determination of the city in that respect shall be final and conclusive." [Sec. 5, Art. VIII, p. 323.]

The Common Council, by Ordinance No. 38847, approved May 22, 1919, heretofore set forth, declares that this sewer should be a joint district sewer, and that it should be paid for in special tax bills.

Section 8 of Article VIII of the Kansas City Charter, as we have shown, provides that the Common Council may, by ordinance, unite two or more sewer districts into a joint sewer district for the purpose of constructing therein a joint district sewer, and also that the council may, by ordinance, provide for the payment of the sewer by the issuing of special tax bills upon such joint district. That was done in this case.

The authority for this action we have discussed and determined in favor of the respondents' contention in the consideration of other phases of this case.

Satisfied of the public importance of this undertaking, we have given the subject much time and thought— not omitting to examine the authorities cited and arguments adduced by the learned counsel for appellant, which we have concluded do not sustain his contentions. We therefore affirm the judgment of the trial court, and it is so ordered. All concur except *Woodson, J.,* absent.