In the Matter of Proceedings to Grade NORTH ELMWOOD AVENUE IN KANSAS CITY, NORTH, Clay County, Missouri.

KANSAS CITY, Missouri, Appellant,

v.

Ben REINWALD et al., Respondents.

No. 43962.

Supreme Court of Missouri.

Division No. 2.

Sept. 13, 1954.

David M. Proctor, City Counselor, Ben Powers, Asst. City Counselor, Kansas City, Robert F. Sevier, Liberty, for appellant.

Williams & Norton, North Kansas City, for respondents.

LEEDY, Judge.

This appeal arises out of proceedings in the Circuit Court of Clay County brought by City of Kansas City, Missouri, under its Ordinance No. 16013 which authorized the grading of a segment of North Elmwood Avenue in that portion of the city lying in Clay County known as Kansas City, North. Some of the abutting property owners challenged the validity of the proceedings by motion to dismiss. Upon a hearing, their motion was sustained, and judgment of dismissal entered. The city has appealed.

The street in question, North Elmwood, runs north and south. The proposed improvement extends south from the south line of Vivion Road (an east and west highway, U.S. 69) to the south line of 50th Street North, a distance slightly in excess of 1000 feet. North Elmwood does not extend south of 50th, nor does 50th extend west of North Elmwood. 50th does extend east from North Elmwood to Brighton, a distance of three or four blocks.

The ordinance provided that the section of the street in question "be graded to the full width thereof and to the established grade of the same," and that there be condemned in the abutting property an easement or right to support the embankment where a fill would be required, and a similar easement to slope back the sides of cuts, and that "just compensation or damages, if any, therefor shall be assessed, collected and paid according to law."

The benefit district prescribed by the ordinance for the assessment of damages accruing to the lands which might be disturbed or damaged by the grading coincided with the assessment district for the apportionment of the cost of the work, i. e., all land on both sides of the street back to the center line between the street graded and the next parallel or converging street in the rear thereof—in this particular instance, to the rear end of the several lots. From the plat those on the east side appear to be 25 feet in width and 138.87 feet in depth; those on the west side 62.5 feet in width and 110.15 feet in depth. In other words, the benefit district included all (but no more than) the area of all lots abutting on the improvement (plus two non-abutting lots on the west side as to which no question is raised, the latter being within prescribed limits).

The charter provisions in relation to grading and regrading of streets, alleys, etc., and the procedure to be followed in that connection, including court proceedings such as here involved, are to be found in Article VII, §§ 224–239.

The question for decision is whether the evidence, all of it introduced by movants, sustained the charge of their motion to dismiss that the proposed taking was for private use without the consent of the owners, in violation of Art. I, § 28, Const. of Mo. 1945, V.A.M.S., and that the benefit district prescribed by the ordinance was unreasonable.

The offending private use was allegedly that of benefiting one Earl Shaw (the owner, or former owner, of all of the abutting property along the west side of the proposed improvement) in this, to wit, that he had "over a period of time, built a number of homes on said property for the purpose of selling the homes to the public; that under the existing regulations of the Veterans' Administration and the Federal Housing Authority it is necessary for there to be a paved road with certain specifica-

tions before these federal agencies will approve loans on homes on the adjacent property." The motion then averred "that the City of Kansas City, through its agents and employes, acting in collusion with the said Earl Shaw, instituted the[se] proceedings * .* * to defraud movants of their property; that the 'ordinance and proceedings thereunder * * * and the alleged public purpose sought to be carried into effect by the ordinance are not for the purposes intended; that the proposed taking is· in truth and in fact to serve the specific purpose of benefiting the said Earl Shaw and making it possible for him to obtain approved VA loans and FHA loans on the property mentioned above."

These same charges are realleged with respect to the unreasonableness of the benefit district, coupled with the further averments that the portion of the street involved in this proceeding "is approximately one block long and a 'dead end street' * * * [which] is now and has been for many years an adequate public street and all-weather road and no reason exists for the City of Kansas City to change the grade of said street or to make any improvements thereon; * *. * that there is no benefit to movants under the proposed grading as provided in the proceedings herein, but to the contrary is damaging to the property of movants and the action of the City Council of Kansas City in this instance is unreasonable."

Respondents (sometimes herein referred to as movants) are the owners of six of the properties and homes located on the east side of the street abutting the proposed improvement, their holdings constituting only slightly more than one-half of the front footage on their (the east) side. Earl Shaw formerly owned all of the lots on the opposite (west) side, on fourteen of which he built homes and sold and conveyed (or agreed to convey) them to the purchasers. The testimony of the several individual movants is thus summarized in their statement of the facts: "North Elmwood Street was a good, practical, all weather street, in

good condition prior to 1951; and the level of the street conformed practically without exception to the same level as respondents' property. In October or November of 1951 Earl Shaw, the builder, came on to the street with graders and dozers and substantially changed the grade of the street so as to make its level more nearly conform to the level of his property on the west side and to the detriment of respondents. He also moved the drainage ditch from the west side to the east side of the street. * * * At least five of the respondents personally complained to Mr. Maring, the then City Engineer [deceased at the time of trial], while the grading was in progress, but nothing was done by the City to stop the illegal and unauthorized acts of the villain, Shaw." While this characterization of Shaw, his acts and his role are beside the point (and, too, in violation of 42 V.A.M.S., Supreme Court Rule 1.08(b) governing the form and content of statements of fact), it may be noted that, in total disregard of their charges against him, movants called Shaw as their own witness and examined him at length. They were under no compulsion to call him, but having done so, they will be deemed to have vouched for his credibility.

Shaw testified, in substance and effect, as follows: He started building houses in the development in November, 1952; that at about that time he did some grading on the street which he described as being only about 14 feet wide with a little oil and gravel on it. While admitting he did not have a permit so to do at the time "because the city wasn't in a position to issue one," he "graded that road in order to conform with what the city's established grade is * * *. I talked to pretty near everybody out there, and they talked to me, and I never did hear a complaint about the grading of that road." The witness further testified in this connection that he had at first proposed that individual "certificates" be signed by the landowners which would have allowed the street to be graded without any court proceedings, and that all agreed to sign, but when he returned with the papers "it was an entirely different story. They

said no, they wouldn't sign it, and at that time there had already been quite a lot of grading done on the street." He further stated that because "those people [movants] would not give permission to me, nor the city, to allow me to grade that street," it had to be done through the city engineer's office and the council, to whom he then applied to have the present proceedings instituted. The witness did not pretend he had ever obtained a permit from the city. He denied having had difficulty in obtaining loans on the homes he built there, and also denied that the reason some of the houses were sold under a contract for a deed was because they could not get a loan on them in the absence of paving. He very frankly stated that he felt morally obligated to pave the street or cause it to be paved, and to that end had deposited in escrow a part of the purchase price received for the homes sold by him—this because the buyers had bought with the idea that such a street was to be built there.

Reed McKinley, Kansas City's Director of Public Works, was also called as a witness by movants. We adopt the summarization of his testimony as it appears in appellant's brief, and as supplemented in movants' brief, as follows: "Never knew Earl Shaw until he met him at recess of court the day of the trial, but believes Shaw may have attended meeting held in re: grading of North Elmwood; that this witness was the one who recommended this Benefit District to the City Council and the ordinance to grade. Describes procedure that must be gone through with in order for ordinance to be passed. Describes regular procedure to initiate one of the ordinances to grade; denies any one came to him on behalf of Shaw to attempt to induce him to recommend this ordinance; describes purpose of hearing in this type of proceeding. Denies he told Shaw it was his responsibility to grade the road. Policy of city to make new grade meet the present one in order to minimize the interference with property.

"In examination by the court, witness testified the first he knew of the grading by Shaw was this morning in these proceedings. Details that this proceeding was normal in every respect. Testifies to the procedure as to waivers of damages when grading is to be done. Section 227, Article VII of Charter of Kansas City, Missouri. Shaw, as the majority front foot owner, could not obtain that and these proceedings were instituted. No legal remonstrance was filed. Section 225, Article VII of the Charter of Kansas City, Missouri. Property owners given more notices in this case than legally required by law. This Benefit District not out of ordinary, coincides with charter as to boundaries.

"The observations regarding the authority of Earl Shaw to change the grade are quoted herewith: 'A. Your Honor, the first knowledge I had of this unauthorized grading developed in the proceedings this morning. He certainly would not be permitted by our office to do any grading without a permit, and we certainly would not issue a permit to grade in front of anybody else's property like these people on the east side of the street unless he presented to us a waiver of damages from those people, which did not occur in either case, so I would say it was unauthorized grading. Whether my forces in the field were delinquent in not catching it and not stopping it, I can't say, because this morning is my first knowledge of it.' "

Movants' other witness was Frank J. Guenther, Assistant City Engineer. The following fair résumé of his testimony is adopted from appellant's statement: "Knowledge of the proceedings leading up to the declaration of necessity in this case is through records, had no personal contact about it. Engineer who handled proceedings prior to this is dead. Produces records showing declaration of necessity in this case filed June 25, 1952. This entire proceeding was only for grading; declaration with reference to paving has not been approved. The city establishes a grade by ordinance, usage does not establish such

a grade; does not know whether Shaw had the established grade because doesn't know when Shaw did the grading. Grade here is not established to conform to the building on west side of road and road will be cut down on west side in some places two to three feet. Witness describes boundaries of Benefit District as to include a tier of lots on both sides of street and two lots not fronting on the street but a part of a lot which does front on the street."

The trial court found the benefit district to be unreasonable, and also that the attempted formation of it constituted "an attempt to take private property for a private use" in violation of the constitutional provision here in question, and so sustained the motion, and dismissed the proceedings. Precisely the same facts are relied on to support both findings; that is, it is movants' position that those facts which they contend render the contemplated use private and not public have the further and simultaneous effect of establishing the unreasonableness of the benefit district. Both points are, therefore, so closely akin and overlapping as to make it inexpedient to undertake to treat them separately.

The constitutional guaranty invoked by movants, Art. I § 28, Const. of Mo., 1945, is found in the Bill of Rights, the text of which provision is as follows: "That private property shall not be taken for private use with or without compensation, unless by consent of the owner, except for private ways of necessity, and except for drains and ditches across the lands of others for agricultural and sanitary purposes, in the manner prescribed by law; and that when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public."

The attack upon the benefit district as being unreasonable, and hence invalid, was not based on any vice, infirmity or defect attributable to, or inhering in, the benefit district as such (that is to say, apart from and in contradistinction to the other terms and components of the ordinance as a whole), as contemplated by the proviso in § 238 of the city charter, to the effect that if a benefit district as prescribed by an ordinance is, upon evidence, found by the judge or court to be unreasonable, such finding, when entered of record in the case, shall have the effect of causing all prior proceedings under the ordinance to be null and void. This provision was obviously intended to apply in a situation where a grading or regrading ordinance would, in other respects, be unimpeachable.

The burden of movants' argument, on both aspects of the case, is that there was no necessity for the improvement. Witness these characteristic excerpts which have been taken at random: "Here is a case of individuals on one side of a street who had an adequate, all weather street. Prior to the grading, illegally done, their property conformed to the level of their street. Now, because of the grading, Kansas City proposes to condemn easements on their property for cuts and fills that would not have been necessary except for the illegal acts. In addition, the illegal grade benefited another party and the city is now attempting to make legal the change he illegally made. * * * After the illegal work of Earl Shaw had become an accomplished fact, at his instance and request Kansas City instituted this proceeding. The Director of Public Works and the City Engineer, on questioning, failed to give one valid reason why the grading and condemnation was necessary—one valid reason why it was a needed public improvement. * * * Isn't it important at all to consider whether an improvement is needed in view of all the facts? * * * What makes the benefit district unreasonable? The fact that it is not necessary; the fact that it is uncalled for; the fact it admittedly has no basis in reason or good sense?"

The distinction between "public use" and "public necessity" has been pointed out in the cases. The former is a judicial question, determinable by the courts; the latter

is esssentially political in nature, and therefore to be determined in a different forum —in the instant case, by the city council, subject to the limitations presently to be noticed. City of Kirkwood v. Venable, 351 Mo. 460, 466, 173 S.W.2d 8, 11; State ex rel. State Highway Commission v. Curtis, 359 Mo. 402, 409, 222 S.W.2d 64, 68; State ex rel. Lane v. Pankey, 359 Mo. 118, 121, 221 S.W.2d 195, 196; City of St. Louis v. Brown, 155 Mo. 545, 555, 56 S.W. 298, 299.

■ "In order to constitute public use, it is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient. * * * Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character." Kansas City v. Liebi, 298 Mo. 569, 593, 252 S.W. 404, 408, 28 A.L.R. 295, as cited approvingly in Bowman v. Kansas City, Mo.Sup., 233 S.W.2d 26, 33.

■ There is no more "public use" to which property can be devoted than that of a public street open alike and accessible to all members of the public. The only taking here involved is that of an integral part of such a·street, i. e., an easement in the properties abutting the improvement to support embankments and to slope back the sides of cuts. This is as much "public use" as that attaching to the traveled portion of the street or that lying between the street lines. There is nothing remotely indicating that Shaw or his vendees propose to appropriate the use of the improved street, or any portion of it, to the exclusion of the public generally. Indeed, just the contrary appears, and so these facts render the situation wholly unlike that of undertaking to establish a street for the *use* of a private individual, and not for the use of the public, as in Kansas City·v. Hyde, 196 Mo. 498, 96 S.W. 201, 205, 7 L.R.A.,N.S., 639, the authority principally relied on by movants. The claim· of the objecting land-

owner in the condemnation there involved was that the proposed extension of a city street was to provide a way for switch tracks to the property of an alderman for his sole private use, and not for the use of the public. Of course, this court declared that if such were the fact, "then it· was a purpose for which the city council had no authority to condemn property, and the passage of the ordinances was an abuse of its power, and the court should adjudge the ordinances void." The facts there in judgment are not in any sense comparable to those in the case at bar. On the other hand, a case bearing striking similarity to this one, as regards the contentions of the objecting property owners and the character of proof offered in support thereof, is that of City of Caruthersville v. Ferguson, Mo. Sup., 226 S.W. 912. There, as here, the question of the alleged public use was raised by motion to dismiss, which motion the trial court sustained, all of the evidence thereon having been introduced by the movants. On appeal to this court, held: reversed, there being no evidence of any fraud or corruption on the part of the city authorities, or others, the necessity, expediency and propriety of the proposed taking was for the city council and not the court. Statements of this governing principle, or variants of it, are to be.found in numerous cases. For example, see Jennings Heights Land & Improvement Co. v. City of St. Louis, 257 Mo. 291, 301, 165 S.W. 741, 742, which holds directly that the action of a city council pursuant to charter powers in establishing a benefit district such as that here under scrutiny is conclusive unless procured by fraud, or there is proof that it is manifestly arbitrary or unreasonable, or that the assessment is palpably unjust and oppressive. State ex rel. Bruenting Realty Co. v. Thomas, 278 Mo. 85, 98, 211 S.W. 667, 670; City of Kirkwood v. Venable, supra; City of Springfield v. Owen, 262 Mo. 92, 103, 170 S.W. 1118, 1120; 14 McQuillin, Municipal Corporations, §§ 38.55, 38.56. The legislative body of the municipality, in the exercise of its power·in matters of the kind here. involved, is "vested with a discretion not subject

to review by the courts, unless it is affirmatively shown to have been exercised arbitrarily, fraudulently, or oppressively." McMurry v. Kansas City, 283 Mo. 479, 498, 223 S.W. 615, 619, and cases cited.

The movants' position both at the trial and on this appeal has been, as stated above, that there was no necessity or "basis in reason or good sense" for grading the street and the consequent condemnation of easements for the purposes mentioned, so that the creation of the benefit district was unnecessary and uncalled for, thus rendering it unreasonable, and the action of the council fraudulent, arbitrary and oppressive. Of a charge that an ordinance was "unjust, unreasonable, and oppressive", this court in Komen v. City of St. Louis, 316 Mo. 9, 15, 289 S.W. 838, 841, said: "These adjectives strike the ear with a harsh resonance. To justify their use in stigmatizing a statute, state or municipal, the most serious and convincing reasons should be adduced. To render a law unjust it must be contrary to right or justice, to render it unreasonable it must be immoderate in its terms, and to render it oppressive it must, in its operation, be harsh, rigorous, or severe." Treating all of the evidence as true, and giving movants the benefit of all legitimate inferences to be drawn therefrom, it can be stated categorically that it not only failed to affirmatively show fraud or collusion between the city and Shaw, but that it did not even tend to prove such, or that the action of the council was in any sense arbitrary, oppressive or unreasonable. For this reason, and because the public nature of the contemplated use is patent, the judgment of dismissal was wholly unwarranted and erroneous. It should, therefore, be reversed, and the cause remanded with directions to overrule the motion to dismiss, and to proceed with the cause in due course. It is so ordered.

DEW and STONE, Special Judges, concur.