E. J. FUNKE, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAILWAY CO., A CORPORATION, APPELLANT.—35 S. W. (2d) 977.

In the Springfield Court of Appeals. Opinion filed February 23, 1931.

348

*E. T. Miller* and *Ward & Reeves* for appellant.

*Stephen Barton* for respondent.

SMITH, J.—This action was begun in the circuit court of Scott county on the 15th day of July, 1929, by filing a petition in two counts. The first count of the petition claimed damages to plaintiff's land on the theory that there was a natural watercourse northwest of plaintiff's land and that the defendant wrongfully and unlawfully diverted the channel of said stream and watercourse by digging a ditch across its right of way and placing a culvert under and across its roadbed and thus wrongfully diverted on plaintiff's land said watercourse to his damage.

At the close of plaintiff's evidence in chief plaintiff elected to stand on the second count of his petition, which second count is as follows:

"Plaintiff states that he is and has been at all times herein mentioned, the owner of the following described real estate, situate, lying and being in Scott County, Missouri, to-wit: All of that part of the west half of the southwest quarter of the northeast quarter of Section 24; Township 28, North, Range 13 East of 5th P. M. lying southeast of the Gulf Branch of the St. Louis Memphis and Southeastern Railroad (Frisco System) containing 18.443 acres.

"Plaintiff further states that defendant is and was at all times herein mentioned a corporation organized and existing under and by virtue of the laws of the State of Missouri.

"Plaintiff further states that defendant owns and operates and did own and operate at all times hereinafter mentioned a line of its railroad along, at and near the northwest corner of plaintiff's land aforesaid; that the water from the hills and land, northwest of plaintiff's said land in 1927, flowed and still flows in a general southeasterly direction, part of which was collected in a body in a stream and drain before it flowed upon the right of way of defendant just across defendant's roadbed to the northwest from plaintiff's said land and at the first concrete culvert across Highway No. 61 south of the crossing of said highway across defendant's railroad near the north line of plaintiff's land aforesaid; that the natural course and flow of said water was thence southwesterly along and on the west side of defendant's roadbed for several hundred feet to a ditch or drain that crossed easterly under defendant's roadbed and across its right of way, thence on in an easterly direction, down which ditch said water naturally flowed; that defendant, after said water had been so collected in the drain on its right of way at point just immediately across its roadbed from northwest corner of plaintiff's said land, wrongfully, unlawfully, and neglectful of plaintiff's rights, discharged said water upon the said land of plaintiff's and intermediate land in a great volume, body, and with concentrated force and at a place where no drain, watercourse or ditch existed to receive it and where it never theretofore naturally flowed; that said wrongful and unlawful discharge of said water and change of its flow was effected by defendant digging a ditch across its right of way and opening a culvert across its roadbed at about the point where the west line of plaintiff's land extended, intersects with the easterly line with defendant's right of way and where there did not, nor never did exist a ditch, drain or watercourse with which to connect said ditch and opening so wrongfully dug by defendant; that on account of the wrongful and neglectful acts of defendant in discharging said water in a body as it did as aforesaid, said water was caused to carry and deposit on plaintiff's said land, said brush, wire, gravel and debris in great volume and to a great depth over several acres of plaintiff's said land which would not have resulted if the natural conditions and flow of said water had been left undisturbed, thereby depriving plaintiff of the use of several acres of his said farm for the years 1928 and 1929, compelling him to be put to great expense in hauling off said debris, wire and brush and damaging and reducing the value of plaintiff's said farm, all to plaintiff's damage in the sum of $1500.

"Wherefore plaintiff prays judgment against defendant in the sum of $1500, and for his costs."

The answer, after admitting its incorporation, was a general denial.

The trial was had to a jury on the 18th day of March, 1930, and a verdict was rendered in favor of plaintiff for $300 damages, and judgment was entered for that amount.

Motion for new trial was filed and overruled, and proper steps were taken for an appeal to this court.

The case is here on four Assignments of Error set out in defendant's brief, which we shall consider in the order set out.

The first assignment is that "The court erred in refusing to sustain defendant's demurrer at the close of the whole case."

The testimony discloses that the plaintiff was the owner of about eighteen and five-tenths acres of land described in the petition. The testimony also shows the railroad of the defendant ran from the northeast of the plaintiff's land in a southwesterly direction and touched the land at its northwest corner, and as the railroad extended south and west it angled away from the plaintiff's land at an angle of something like forty-five degrees, so that the south part of plaintiff's land was a considerable distance from the railroad. The north part of plaintiff's land was referred to as high land and the south part as high land, and all the evidence went to show that there was a low strip or depression extending across the tract in a southeasterly direction. It was a controverted question as to the width of the strip referred to as low lands. Some of the testimony went to show that the low land strip commenced at or near where the railroad began to angle away from the plaintiff's land going southwest, and some was to the effect that the low land commenced some distance south of where the railroad left the land, and that it was high land where the railroad left plaintiff's land. The testimony showed that High-way No. 61 coming from the east extended across the northern boundary of plaintiff's land and crossed the roailroad at a point where the railroad touched the land coming from the northeast, and that after the highway crossed the railroad right of way it turned in a southwesterly direction and for some distance ran parallel or practically so to the railroad. According to a plat prepared by defendant this highway ran practically parallel to the railroad for about eight hundred feet to where there was an opening under the railroad to let the water from the northwest pass. This was an old opening that had been there for many years, possibly from the time of the construction of the railroad, and hereafter we shall refer to it as an old opening. Practically even with this old opening there was also an opening across Highway No. 61 which was bridged, and the water from the northwest came through these openings and went in a southeasterly direction across some land owned by others and finally crossed the plaintiff's land, but there was no fixed channel as it crossed plaintiff's land. Some of the witnesses said it just eased its way across, and spread out over plaintiff's land as it·went. To

the northwest of the old opening the water came and gathered in a grove referred to as walnut grove, and it is a controverted question as to how the water got out of walnut grove. Some said its natural course was to go south to the old opening. Others said that the water came into this walnut grove from different directions, some of it from the west and some of it from the northwest, and some from the north, and that it gathered in this grove, while part of it went to the old opening, yet, in times of high water or rainy seasons it would break over the railroad at or near where the railroad left plaintiff's land and often washed out the railroad at this place, tending to show that that was also the natural course of a part of the water to take.

The testimony showed that between the railroad and the highway extending from the plaintiff's land to the old opening there was a ditch, or had been one which originally carried water to the old opening, but that said ditch at times would become filled with sand and debris. The testimony does not show the height of the railroad dump nor the height of the highway immediately to the northeast of the old opening. According to the plat this old opening was 500 or 600 feet from where the railroad leaves the plaintiff's land. The railroad company constructed an opening which we shall refer to hereafter as the new opening, at a point near where the track left the plaintiff's land, where the water had often washed out the track, which new opening is about 400 or 500 feet from the old opening. Opposite this new opening through the railroad dump there had been constructed an opening through Highway 61. This opening in highway 61 had been constructed before the railroad company had constructed the new opening. The walnut grove appears to be north and west of the old opening and the new opening. The plat shows, and other testimony is to the effect, that north of the new opening there has been constructed a ditch about sixteen feet wide at the top and about ten feet wide at the bottom and about four feet deep, which in rainy seasons brings water from the north and into walnut grove just north of the new opening. There was water in this ditch only in rainy seasons, and the defendant contends it was only taking care of surface water when it made the new opening through its roadbed, and that it had a right so to do.

The plaintiff contends that before the new opening was made, the water as it came from the north and west collected in walnut grove and then went southwest to the old opening and then after passing through the old opening it spread out as it approached his land and spread out over his land, but did no damage to his land and that he was able to cultivate his land prior to the construction of the new opening, but that since the construction of the new opening the water which had been permitted to collect in this walnut grove coming out of the ditch above referred to, and from the northwest, was released

by the new opening and caused to be turned in a body on to his lands considerably further north than where it reached his lands when coming through the old opening, and that by reason of the new opening constructed by the defendant the water was turned on his land not only at a new and different place but with such force and power that it cut and washed out a channel as it left the opening and ditch so constructed by defendant, and brought large quantities of white sand, referred to as building sand, and other debris and spread this white sand as much as thirty-two inches deep in some places rendering that part of his land entirely worthless; that before the construction of the new opening the sand was not there, and that the sand and other debris was put there by reason of the acts of the defendant in constructing the new opening and causing the water to be turned loose on his lands at a different place and in a greater volume.

The defendant in its brief contends, and properly so, that surface water is a common enemy and every man has a right to fight it, and says, "But there is one thing he cannot do, and that is he cannot collect this surface water in a body, and as such precipitate it on his neighbor to his neighbor's damage."

The plaintiff in his brief says, "It is true a person can fight surface water but the right is not an unlimited one. The limitations are that he cannot collect, accumulate, permit its collection on his premises and then turn it on to the subservient owner in increased volume with greater velocity at a new place and injure the lower owners land." So it seems to us clearly that it is around these two contentions that the first assignment of error hinges.

The defendant's testimony, the plat, shows that the new opening was fourteen and five-tenths feet long, and that the open space for water to pass through contained forty-two square feet, and as a matter of mathematical calculation, this would show that the opening would be approximately three feet deep. There was testimony tending to show that this opening was constructed to extend to the right of way line and to the opening or ditch across the highway and then across to the right of way line on the other side of the railroad track. The plaintiff contends that this ditch extending from the highway line across the railroad right of way under the track and through its dump gathered and precipitated the water, which would have ordinarily gone down the railroad, through the dump and across the right of way on to the plaintiff's land at a different place and with more force and power, to his damage.

It is conceded that the defendant constructed the new opening and that this new opening received water into it in rainy seasons, and that this opening permitted water to cross its right of way and there was proof that this water entered upon the plaintiff's land at a different place from where it formerly entered, and that this per-

mitted sand and debris to be taken on to plaintiff's land, where sand in such quantity had not been before.

The law in this State is plain and well understood that the defendant had a right to protect itself from surface water, but it had no right to allow that water to collect on its premises and then discharge it at one point in a body on to plaintiff's premises, to his hurt. In the case of Ready v. Mo. Pac. Ry. Co., 98 Mo. App. 467, 72 S. W. 142, at page 469 the court quoted with approval from another case this language:

"According to the rules of the civil law, as adopted by many, if not the most of the states of this Union, the owner of the higher adjoining land has servitude upon the lower land for the discharge of surface water naturally flowing upon the lower land from the dominant estate. But it is well settled by the decisions of the courts which follow the civil law that this servitude extends only to surface water arising from natural causes, such as rain and snow, and that the owner of the higher land cannot collect the surface water in drains, trenches or otherwise and precipitate it in a body upon the lower land to the damage of the owner thereof."

We think the testimony was sufficient to go to the jury on the question of digging a ditch from under the railroad track out to the ditch which had been constructed under the State Highway and then across to the other side of the railroad track out to the edge of the right of way towards the plaintiff's land. And there was sufficient evidence to go to the jury on the question of the collection of surface water in this ditch or new opening and the precipitation thereof in a body or stream upon the lands of the plaintiff.

We must rule against the defendant on the first assignment and we think we are sustained in this conclusion by the ruling in the case of Tucker v. Hangan, 300 S. W. 301, local citation 303 and cases cited therein, for if it be conceded that this water was only surface water there was a question for the jury under the evidence as to whether it was left to its natural course of drainage and whether or not it was precipitated through the opening upon plaintiff's land and to his damage.

The defendant in its second assignment and in its brief complains that "The court erred in admitting incompetent, immaterial and irrelevant testimony offered by the plaintiff, etc., and insists (a) that error was made in admitting testimony to show the condition of the old opening in the right of way, because there was no pleading attacking the old opening." We think no error was committed here, because the evidence was that the water collected in the walnut grove and that this grove extended from opposite the old opening up to near the new opening, and if the old opening had become filled to a certain extent, as some testified, it would have a tendency to show that the water might be collected and forced to the new opening.

(b) One witness when called by the plaintiff, said that he was supposed to be a witness for the defendant, "But they didn't use me by some hook or crook, I don't know why." The attorney for the defense objected to that statement and asked that the jury be discharged. The court refused to discharge the jury but at that time instructed the jury as follows: "Court will direct the jury to disregard that. That was a very unnecessary and unaccounted for statement on the part of this witness, that he was a witness for the Frisco and not called. I am directing the jury to disregard it, and get the facts from the witnesses in the lawsuit." We agree that such a statement was unnecessary on the part of the witness and improper, yet in view of the directing instructions given immediately by the court we think it was not reversible error to refuse to discharge the jury.

(c) Objections were made as to witnesses testifying as to opinions and conclusions as to the amount of plaintiff's damages. We have examined the testimony questioned under this assignment and while it is a general rule that opinion evidence is not admissible to prove damages, yet witnesses who are shown to be acquainted with the lands and the damage done to it, and whose testimony shows they are acquainted with the situation, are permitted to state their opinion as to the amount of damages and the value. [Sinclair v. M. K. & T. Ry., 70 Mo. App. l. c. 70.] In this connection we think the court by instruction No. 2 properly instructed the jury as to the measure of damages as being "The difference, if any, in value of such land immediately before the construction by defendant of the north trestle and ditch across its right of way thereat, and after all injuries, if any, occasioned by the different overflows occurring between the construction of said trestle and ditch and the filing of this suit on July 13, 1929." While the questions asked the witnesses might have been directed exclusively to the value of the lands before the construction of the ditch and the value of the land after the construction and after the sand and debris was thereon, and such questions would have been proper, yet the answers thereto would have largely been opinions, for the value of real property is largely a matter of opinion anyway, and since that is true no error was committed here in permitting the witnesses to give the amount of the damages, for at most it was giving direct the amount of damages, instead of giving the value of the land before the construction of the ditch and its value afterwards, which in fact some of the witnesses did do before their testimony was ended. So in view of the court's instruction on the measure of damages, we think reversible error was not committed in the introduction of this evidence.

The defendant insists error was committed in admitting as evidence certain photographs. These photographs were identified by a witness who said he was present when they were made and that they

fairly represented the conditions that existed at the time they were taken. Other witnesses testified that they were not correct and that they did not represent the true conditions. Several witnesses testified as to the conditions before the construction of the new opening and as to the conditions thereafter and as to the sand and debris being on the land after the opening at the place shown by the photographs, and as to the other conditions as shown by the photographs, so we think no error was committed in admitting them, even though contradicted by witnesses on the stand. They constituted part of the testimony offered for the jury's consideration as to a determination of the facts. [Johnson v. Kansas City, 272 S. W. 703, 704, and cases cited. Fuller v. Robinson, 230 Mo. 22, 1. c. 57, 130 S. W. 343 and cases cited.]

We think no error was committed in giving plaintiff's instruction Nos. 1 and 2. Instruction No. 1 is as follows:

"The court instructs the jury that if you find and believe that the water which collected in the old Hunter ditch used to flow down same till it got into what is termed the walnut grove west of the new trestle in evidence, and then spread out over level land but finally flowed in a natural way down to and under the old trestle in evidence, if it did, and if you find that several years ago that water was collected and caused to flow down to north public road culvert and thence in a southwesterly direction down the west side of the defendant's road bed to the old trestle and if you find and believe that defendant dug a ditch across its right of way under the new trestle in evidence and turned said water from where it formerly and naturally flowed across the defendant's right of way at the old trestle if you so find and if you further find defendant at said new trestle turned said water on to plaintiff's land and intermediate lands at a different place to where it used to flow on his land and in greater volume and with greater force and that on account thereof plaintiff was damaged, then your verdict will be for the plaintiff if you find further the facts as outlined in the other instructions herein."

This instruction submitted to the jury the issues as contended for by plaintiff's petition and as to which there was sufficient competent evidence to make it an issue to be submitted to the jury, and we have already stated above that we think instruction No. 2 fairly submitted the measure of damages.

We do not agree with the defendant that error was committed in refusing to give requested instructions lettered B, E, H, and I, offered by the defendant. Instruction B is practically a peremptory instruction to find for the defendant, and was properly refused. We think instructions E, H, and I were sufficiently covered in other instructions given, and, that no error was committed in refusing them.

We think no reversible error was committed in the trial of the case and that the judgment should be affirmed. It is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.