**VOLLRATH et al. v. WABASH R. CO.**

No. 2052.

District Court, W. D. Missouri, W. D.

May 6, 1946.

Jess M. Fisher, of Kansas City, Mo., for plaintiffs.

Sam B. Sebree, of Kansas City, Mo., for defendants.

COLLET, District Judge.

Plaintiffs, servient owners of lowlands, bring this action against defendant railroad company for damages resulting from the cutting by defendant of its railroad embankment located across the bottom along the upper or north boundary of plaintiffs' farm, thus allowing flood water to pass through that opening in a concentrated stream onto plaintiffs' land below. The plats in evidence adequately portray the topographical conditions as they now exist. There is little dispute concerning the facts. Tersely stated, the primary legal question is whether the railroad which occupies the position of the dominant landowner, is liable for damages resulting to the landowner below from the cutting of an artificial barrier, in this case an embankment upon which the railroad's tracks are laid, which heretofore served in times of flood to impound the overflow waters of Musselfork Creek above and north of the embankment and confine those waters to the one opening previously existing over the channel of that creek. The new opening or cut in the embankment was made for the purpose of releasing these flood waters and thereby preventing them from overflowing the embankment and washing out the defendant's tracks, which had occurred several times. Prior to the cut a system of levees maintained by plaintiffs and connected with defendant's embankment under written contract with defendant under which the connection could be severed when necessary to the protection of defendant's embankment served as substantial protection to plaintiffs' farm from overflow from above. Now when the creek overflows north of the railroad embankment the flood water rushes through the new cut with great speed and force onto plaintiffs' land, causing serious damage. No lateral ditches have been constructed along the upper side of the embankment which serve to lead the water through the cut and onto plaintiffs' land. A ditch exists on the north side of the embankment but it is one such as the Missouri statute requires and has a bank on its south side next to the embankment which does not permit ordinary run-off water to flow through the cut. The level of the land on defendant's right-of-way immediately south of the cut is higher than the lateral ditch bed or its bank.

[1, 2] It is well established that overflow waters are to be treated as surface water in Missouri. Goll v. Chicago & Alton R. Co., 271 Mo. 655, 197 S.W. 244; Place et al. v. Union Township et al., Mo. App., 66 S.W.2d 584; Jones v. Chicago, B. & Q. R. Co., Mo.App., 100 S.W.2d 617; Tackett v. Linnenbrink, Mo.App., 112 S.W. 2d 160; Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118. That the common law has been adopted in Missouri is also clear. Goll v. Chicago & A. R. Co., supra. The common law relating to the rights and obligations of adjoining proprietors with respect to surface water has undergone some development since the early pronouncement

of the common law doctrine. What those refinements and modifications are, with respect to a factual situation such as is presented by the present record, are more definitely determined by an examination of the gradual development of the law in Missouri.

While it was not the first case on the subject, Hosher v. Kansas City, St. J. & C. B. R. Co., 60 Mo. 329, probably states the early rule more definitely than other early cases. The rule was stated in that case in the following language (60 Mo. loc. cit. 333): "But in the case of surface water, which is regarded as a common enemy, he is at liberty to guard against it, or divert it from his premises, provided he exercises reasonable care and prudence in accomplishing that object. In the language of this court in a recent case, where this subject was carefully considered, the owner of the dominant or superior heritage 'must improve and use his own lands in a reasonable way, and in so doing he may turn the course of, and protect his own land from, the surface water flowing thereon; and he will not be liable for any incidental injury occasioned to others by the changed course in which the water may naturally flow, and for its increase upon the land of others. Each proprietor, in such case, is left to protect his own lands against the common enemy of all.' " Citing McCormick v. Kansas City, St. J. & C. B. R. Co., 57 Mo. 433; Imler v. City of Springfield, 55 Mo. 119, 17 Am.Rep. 645; and Jones v. Hannovan, 55 Mo. 462.

That doctrine had been followed before, see Imler v. City of Springfield, 55 Mo. 119, 17 Am.Rep. 645, Jones v. Hannovan, 55 Mo. 462, and with the exception of McCormick v. Kansas City, St. J. & C. B. R. Co., 70 Mo. 359, 35 Am.Rep. 431, and Shane v. Kansas City, St. J. & C. B. R. Co., 71 Mo. 237, 36 Am.Rep. 480, both of which expressly followed the Code Napoleon, Sec. 640, the Missouri courts have thereafter steadfastly asserted that the common law or "common enemy" doctrine was the law in Missouri. Benson v. Chicago & A. R. Co., 78 Mo. 504, loc. cit. 512; Goll v. Chicago & A. R. Co., 271 Mo. 655, 197 S.W. 244; Tackett v. Linnenbrink, Mo.App., 112 S.W. 2d 160; Abbott v. Kansas City, etc., R. Co., 83 Mo. 271, 53 Am.Rep. 581; Grant v. St. Louis, I. M. & S. Railroad Co., 149 Mo. App. 306, loc. cit. 310, 130 S.W. 80; Jones v. St. Louis, I. M. & S. Ry. Co., 84 Mo. 151, loc. cit. 155; Moss v. St. Louis, I. M. & S. Ry. Co., 85 Mo. 86; Walther v. Cape Girardeau, 166 Mo.App. 467, loc. cit. 476, 149 S.W. 36; Jones v. Wabash, St. L. & P. Ry. Co., 18 Mo.App. 251, loc. cit. 257.

The "common enemy" doctrine, so frequently referred to as the "common law" rule, enforced literally would permit the property owner whose estate was higher in elevation than his neighbor to throw surface water onto his neighbor below in any manner, leaving to the latter the necessity, coupled with the legal right, to protect himself as best he could. And to the extent, if necessary, of damming the water back onto the so-called "dominant" proprietor.

But at the inception of the announcement and definition by the Missouri courts of the common enemy doctrine the literal meaning of the term was qualified by such expressions as "in the absence of any negligence, unskilfulness, or mismanagement." Clark's Adm'x v. Hannibal & St. J. R. Co., 36 Mo. 202, loc. cit. 224. The qualification would seem to have been unnecessary and possibly resulted in some subsequent confusion. For the negligent performance of a lawful act would ordinarily furnish ground for recovery irrespective of the law relating to water rights. And on the other hand the exercise of a right conferred by the common enemy doctrine could not be characterized as negligence per se. In the later case of Imler v. City of Springfield, 55 Mo. loc. cit. 126, 17 Am.Rep. 645, the Court so implies, for there it is held that the failure to do that which the common enemy doctrine did not require be done could not constitute negligence and created no liability.

Shortly after Clark's Adm'x v. Hannibal & St. J. Railroad Co., supra, in Jones v. Hannovan, 55 Mo. loc. cit. 467, the same court said: "Surface-water is considered a common enemy that each proprietor may and must fight for himself, with a view to protect himself, without being responsible to others therefor, provided he does so in an *usual* and careful manner." Just what the court intended by the use of the word

"usual" is not clear. Possibly it was the first outcropping of the doctrine of the civil law as yet unrecognized in Missouri. Speculation will serve no good purpose. But certainly the civil law rule definitely appeared, albeit without announcement, in McCormick v. Kansas City, St. J. & C. B. R. Co., 57 Mo. 433, at page 439, wherein the court said: "While the defendant had the right to drain the surface water from its road bed, so as to protect the same for continued and profitable use, it should have been done in a reasonable manner with reference to the rights of others. If there was a running stream of water in the vicinity of the road, into which the water could have been drained by a ditch cut on defendant's own land, that should have been done. If there was no such stream convenient, the water should have been drained off by culverts or otherwise, so as to occasion no unnecessary inconvenience or damage to plaintiff." Citing Kauffman v. Griesemer, 26 Pa. 407, 415, 67 Am.Dec. 437, and Waffle v. New York Central R. R. Co., 58 Barb. [N.Y.] 413.

The two cases cited are expressly based upon the civil law. While the court may have strayed away from the common law "common enemy" doctrine in this first McCormick case, it promptly returned to that rule the following year in Hosher v. Kansas City, St. J. & C. B. R. Co., 60 Mo. 329, wherein it used the language heretofore quoted from that opinion. It is of some significance in the light of future developments that, although in the Hosher case the court only quoted that part of the opinion in McCormick v. Kansas City, St. J. & C. B. R. Co. which embodied the unqualified common enemy doctrine, and, by eliminating any reference to the civil law qualification of that rule found in the McCormick opinion discarded those qualifications, the court in the Hosher case first uses such terminology as "dominant or superior heritage", terms common to the civil law doctrine but unknown to the theory that all proprietors possessed an equal right to defeat the "common enemy."

Shortly thereafter the McCormick case came to the court again and the civil law was expressly adopted. The unrestricted right of a landowner to protect himself by the erection of embankments and otherwise was supplanted by the doctrine that, "Where two fields adjoin, * * * and one is lower than the other, the lower must necessarily be subject to all the natural flow of water from the upper one. * * * Hence the owner of the lower ground has no right to erect embankments whereby the natural flow of the water from the upper ground shall be stopped; * * *." McCormick v. Kansas City, St. J. & C. B. Railroad Co., 70 Mo. 359, 35 Am.Rep. 431.

And of far greater importance because of its lasting imprint on the future law of the state was the further announcement, " * * * nor has the owner of the upper ground a right to make any excavations or drains by which the flow of water is diverted from its natural channel, and a new channel made on the lower ground; nor can he collect into one channel waters usually flowing off into his neighbor's fields by several channels, and thus increase the wash upon the lower fields. * * * If the owner of the upper ground wrongfully direct an unnatural quantity of water upon the ground of a lower neighbor, by collecting several streams together and discharging them at one place, or by any other means, the neighbor below may have an action against him. * * * No one can divert a natural water course and stream through his land, to the injury of another, with impunity; *nor can he, by means of drains or ditches, throw the surface water from his own land upon the land of another, to the injury of such other.*" (Italics supplied.)

The court again adhered to the civil law rule in Shane v. Kansas City, St. J. & C. B. R. Co., 71 Mo. 237, 36 Am.Rep. 480.

In the Benson case, supra, 78 Mo. 504, the common enemy doctrine is referred to as the general rule: "The general rule, it is true, applicable to the enjoyment of real estate is expressed in the maxim: cujus est solum, ejus est usque ad coelum. He has ordinarily, the right to use and improve his real estate by protecting it against water flowing over its surface. In doing so the dominant proprietor may turn it from his land on to the servient or lower land, without liability to damages. Ang.Wat.Courses, 120. Mere surface water, that which does

not run in any defined course or confined channel, is regarded as a common enemy, against which any land owner affected by it may fight. Hoyt v. City of Hudson, 27 Wis. 656 [9 Am.Rep. 473]; Hosher v. Kansas City, etc., R. Co., 60 Mo. 333."

Then follows the civil law qualification stated in the following language: "Whatever may be the rule prevailing in some states, it seems to be established in this State, that in respect even to surface water the dominant proprietor has no right in diverting it to obstruct its egress by collecting it together, as in artificial ditches, and conduct it to and discharge it upon the servient land, in increased volume, thereby subjecting the latter estate to a burden and injury it otherwise would not have suffered." Citing McCormick v. Kansas City, St. J. & C. B. R. Co., 70 Mo. 359, 35 Am. Rep. 431; and Shane v. Kansas City, St. J. & C. B. R. Co., 71 Mo. 237, 36 Am.Rep. 480. To the same effect is Stewart v. City of Clinton, 79 Mo. 603, loc. cit. 612.

But in Abbott v. Kansas City, St. J. & C. B. R. Co., 83 Mo. 271, 53 Am.Rep. 581, the rule of the civil law declared in the McCormick and Shane cases was expressly repudiated and overruled, and the court declared adherence to the common law doctrine, without re-stating that doctrine. It refers to the Benson and Stewart cases as having "practically" re-affirmed the common law doctrine, without discussion of the qualification of that doctrine appearing in those cases to the effect that one may not *collect* surface water "as in artificial ditches", and discharge it in increased volume on the "servient" land. The query is suggested from the objective contemplation of the Missouri case law up to this point, as to whether the express renunciation in general terms of the civil law in the Abbott case and its approval of the Benson and Stewart cases without condemnation of the qualification of the civil law referred to in those two cases, was not the inception of the engraftment of that portion of the civil law appearing in the Benson and Stewart cases to the common law in Missouri.

It is reasonably clear that the prohibition of the civil law against building embankments in protection against the flow of surface water thereby causing injury to the landowner above, was not engrafted upon the common law common enemy doctrine in Missouri. Jones v. Wabash, St. Louis & P. Ry. Co., 18 Mo.App. 251; Goll v. Chicago & A. R. Co., 271 Mo. 655, 197 S.W. 244; Jones v. Chicago, B. & Q. R. Co., Mo. App., 100 S.W.2d 617, loc. cit. 627; Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118. The cases of McMurry v. Kansas City et al., 283 Mo. 479, 223 S.W. 615; Geisert v. Chicago, R. I. & P. R. Co., 226 Mo.App. 121, 42 S.W.2d 954, and Jennings Heights Land & Imp. Co. v. City of St. Louis, 257 Mo. 291, 165 S.W. 741, all dealt with waters in natural water courses. Hence the declaration appearing in each of the latter three cases and stated in the Geisert case that [226 Mo.App. 121, 42 S.W.2d 957]: "It is elementary that the servient owners must suffer the consequences of the unrestrained flow of drainage onto their lands from those of the dominant owners."—does not conflict with the rule announced in the cases heretofore cited which places no such obligation on the so-called "servient" estate as to surface water.

But the conclusion is inescapable that so much of the so-called civil law as made actionable the artificial collection of surface water and its concentrated discharge onto an adjoining proprietor's estate to the latter's injury, has been engrafted upon and adopted as the law of Missouri:

"And of course it is an actionable injury and nuisance for one to collect surface waters and cast them in a body upon a neighboring proprietor." Paddock v. Somes, 102 Mo. 226, loc. cit. 237, 14 S.W. 746, loc. cit. 749, 10 L.R.A. 254.

"The principle of the common law is that, while the owner of adjoining property is not responsible for the natural flow of water across his land on to the land of his neighbor, yet he is liable if he collects it in a quantity by artificial means, and discharges it in a flood on his neighbor's land." Reedy v. St. Louis Brewing Ass'n et al., 161 Mo. 523, loc. cit. 535, 61 S.W. 859, loc. cit. 861, 53 L.R.A. 805.

In Ready v. Missouri Pacific R. Co., 98 Mo.App. 467, 72 S.W. 142, 143, a railroad cut a ditch and installed a culvert in such a

manner that surface water which had formerly spread out over plaintiff's property was caused to rush through the culvert onto plaintiff's premises. The court said: "The law in such state of case is plain and well understood. Defendant, as it contends, had a right to protect itself from injury by surface water. But it had no right to allow that water to collect on its premises, and then discharge it at one point, in a body onto [plaintiff's] premises."

And in Grant v. St. Louis, I. M. & S. Railroad Co., 149 Mo.App. 306, loc. cit. 310, 130 S.W. 80, loc. cit. 81: "The common-law rule which is in force in this state is that surface water is a common enemy against which each land owner may guard in his own way, and he will not be responsible for damages to his neighbor by reason of the fact that, in improving his own land, if he does it in a proper manner, surface water may thereby be turned upon his neighbor; but this general rule has its limitations, one of which is that a party cannot collect surface water upon his own premises and discharge it in a body upon the land of his neighbor to his injury."

In Rychlicki v. City of St. Louis, 98 Mo. 497, 11 S.W. 1001, 4 L.R.A. 594, 14 Am.St. Rep. 651, the court states that with respect to the collection of surface water and precipitating it in a body upon the lower land the civil law and the common law are the same. That case is referred to with approval in Ready v. Missouri Pac. R. Co., supra, and again in Funke v. St. Louis-San Francisco R. Co., 225 Mo.App. 347, loc. cit. 354, 35 S.W.2d 977, loc. cit. 980, where it is stated: "The law in this state is plain and well understood that the defendant had a right to protect itself from surface water, but it had no right to allow that water to collect on its premises and then discharge it at one point in a body on to plaintiff's premises, to his hurt."

Again in Tucker v. Hagan, Mo.App., 300 S.W. 301, loc. cit. 303, the court said: "It is not permissible for the dominant proprietor, in the exercise of his undoubted right to fight against surface water, to collect the same in a large body, conduct it by artificial means, as by a ditch, and discharge it upon the servient estate in an increased volume." To the same effect are Goll v. Chicago & A.

R. Co., supra, and Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118.

The foregoing cases all dealt with ordinary surface water as it fell from the skies and promptly ran off the land. None dealt directly with the question of whether the impounding or collection of overflow water and its discharge in a concentrated volume was actionable. But the language of the Missouri Courts has been unqualified and unequivocal that waters overflowing the banks of natural water courses must be treated as surface water. So treating such water, it must follow that they may not be impounded or collected by artificial means and cast in a concentrated volume on the landowner below without resulting liability. That the overflow waters of the Musselfork were collected and impounded by the defendant's embankment is not and cannot be denied. To alleviate that very condition was the occasion for the construction of the opening complained of.

But it is inconsistent with any sense of fairness or logic to assume that a landowner must by the maintenance of an artificial embankment protect his neighbor below from waters of any character which otherwise would flow upon the lower proprietor's estate. And so said the Missouri Court with respect to waters in a natural water course in Geisert v. Chicago, R. I. & P. R. Co., 42 S.W.2d loc. cit. 957: "We know of no law requiring the railway company to construct or maintain an artificial barrier to protect the lower proprietors from the waters coming down Becker branch, even though these waters had been diverted from their natural channel by the acts of the defendant Becker; surely not, if the diversion resulted from natural causes." See also McMurry v. Kansas City et al., 283 Mo. 479, 223 S.W. 615.

If the defendant is not required to maintain protection for the proprietor below from the surface water coming down from above and yet is responsible in damages when he collects and impounds such water and casts it in a concentrated volume onto his neighbor below, then what is the correct measure of his rights and responsibilities in a case like this where the damage is caused by both the concentration and also

from the overflow which would occur if the embankment was not there?

While the industry of counsel has not produced an authority answering that question, the answer appears to be obvious that liability exists for the damage resulting from the doing of that which the law does not sanction, and no liability may be predicated upon the failure to do that which the law does not require. Applied to the case at bar the result is that the defendant is liable for the damage to plaintiffs' estate which results from the concentrated flow of surface water upon that estate caused by the artificial condition created by defendant, and is not liable for any damage to that estate caused by such overflow as would occur absent the embankment. [Or with an embankment having sufficient openings or retards to eliminate the damaging currents incident to the concentrated flow through a relatively small opening.]

Since several cases heretofore cited deal with the law of Eminent Domain and are determined by considerations emanating from that source of the law, the distinction between those cases and the case at bar should be noted. Absent statutory qualifications, the ascertainment of damages in Eminent Domain proceedings is upon the assumption that the property taken will be used in the most disadvantageous manner to the owner of the remainder tract, consistent with reasonable care and consistent with the manner of use which may be reasonably expected in the light of the purpose for which the acquired tract is taken. Hence it is to be assumed, ordinarily, that damages resulting from a change in the manner of use of property taken in such proceedings from the manner of use to which the tract was first put after acquisition, was compensated for in the original taking, provided, of course, the subsequent use was one within the original purpose and to be reasonably expected in carrying out that purpose. Clark's Adm'x v. Hannibal & St. J. R. Co., 36 Mo. 202; Benson v. Chicago & A. R. Co., 78 Mo. 504, loc. cit. 513; Moss v. St. Louis, I. M. & S. Ry. Co., 85 Mo. 86. The Moss case is a fair example of those cases. It was there held: "Where a railroad company, as in the case at bar, condemns land by the appropriate method for that purpose, and then, without negligence, unskilfulness, or mismanagement, constructs its road and the embankment therefor, obstructing thereby no natural channel of water, the injuries done by such embankment by causing water to flow over the land of adjoining proprietors, will be regarded as but the natural incidents and consequences of that which the corporation, by reason of condemning the land, and paying the damages assessed, had acquired a lawful right to do; and for which injuries no action will lie, damages for them being assumed to be included in those already assessed. And the right of a railway company, after having constructed its road bed, to make such changes therein as experience may designate as proper, is of necessity, a continuous one; for the idea is not to be tolerated that the company, having bought and paid for a right, should be denied the fullest and freest exercise thereof. Those views, in substance, have found recent expression in the decisions of this court. Jones v. [St. Louis, I. M. & S.] Railroad [Co.], 84 Mo. 151, and Abbott v. [Kansas City, St. J. & C. B.] Railroad [Co.], 83 Mo. 271 [53 Am. Rep. 581]."

But this proceeding is not based upon the law of Eminent Domain—it is not asserted, and the evidence does not indicate, that the present owners stand in the shoes of those who owned the remainder tract at the time of the original appropriation of defendant's right-of-way. The hypothesis of the cases based upon the law of Eminent Domain is therefore not applicable here, and the situation must be viewed as if the defendant constructed its embankment adjacent to, but not on any part of plaintiffs' land.

 It is also suggested that, since the Missouri statute, Sec. 5222, R.S.Mo.1939, Mo.R.S.A., not only authorizes but compels the making of openings in railroad embankments for the purpose of permitting surface water (as well as that in natural water courses) obstructed in its flow by the construction of the embankment to flow therethrough, no liability should result from compliance with that statute. But this statute does not require the construction of such openings unless the opening will con-

nect with a "ditch, drain or water course." Grimes v. St. Louis & S.W. Railroad Co., 184 Mo.App. 117, 168 S.W. 317, 318; Slinkard v. Missouri Pac. R. Co., Mo.App., 294 S.W. 446. Not necessarily a running stream (Pace v. St. Louis Southwestern Railroad Co., 174 Mo.App. 227, 156 S.W 746), but a well defined channel or receptacle and not a mere depression or swale with no channel or banks. Byrne v. Keokuk & W. R. Co., 47 Mo.App. 383.

"It is sufficient if it be a slough or lake and is adequate to receive and furnish an outlet for the water complained of." Pace v. St. Louis Southwestern Railroad Co., 174 Mo.App. 227, 156 S.W. 746, 747.

The borrow pits or ballast pits located adjacent to the embankment on the lower side may be characterized as a lake because of their size, but two obstacles arise to prevent the application of the statute on account of their existence. First, it is very doubtful if the statute was intended to apply to overflow water under circumstances existing here, and second, if the statute was intended to apply to such waters, the pits were wholly inadequate "to receive and furnish an outlet for the water complained of." Pace v. St. Louis Southwestern Railroad Co., supra. This statute constitutes an exception, as to railroads, of the rights and obligations existing under the general law of the State. Byrne v. Keokuk & W. R. Co., 47 Mo.App. 383. And it furnishes no protection to the railroad from liability arising under the general law unless the act complained of is one within the purview of the statute.

"Neither may defendant open a crossing through its right of way for the water accumulated from the discharge of Cane creek in plaintiff's fields and the surface water and discharge it upon the lands of an adjacent proprietor to the south, when no ditch, drain or watercourse to carry it is present, without becoming liable to respond in damages to the adjacent proprietor whose land is thus submerged. See Byrne v. Keokuk & W. R. Co., 47 Mo.App. 383; Grant v. St. Louis, I. M., etc., R. Co., 149 Mo.App. 306, 130 S.W. 80." Grimes v. St. Louis & S.W. Railroad Co., supra, 184 Mo. App., loc. cit. 122, 168 S.W. loc. cit. 318.

The converse of the rule just stated is obviously correct and defendant cannot be held liable for the construction and maintenance of the lateral ditch it constructed many years ago along the upper side of the embankment to carry rainwater along the north side of the right-of-way to the Musselfork at the old bridge. Certainly that is true since that ditch does not serve to direct any water through the opening complained of and onto plaintiffs' land.

The settlement of the question of liability and the extent thereof unfortunately does not determine this action. Although a finding may and has been made of the entire damage to the farm occasioned by its present susceptibility to overflow *and* injury from the concentrated flow of impounded water upon and across it, there is no evidentiary basis for a finding of the amount of damage occasioned by the impounding and concentrated flow separate from the injury from overflow without such concentration. All of the witnesses testifying on the subject were confined to an estimate of the fair market value of the farm immediately before and immediately after the construction of the opening. And all of plaintiffs' witnesses predicated their estimates upon the assumption that plaintiffs were entitled to the protection from natural overflow which the embankment afforded.

If plaintiffs see fit, within 10 days, to move for the re-opening of the case for the reception of evidence on the question of the damages resulting from the concentrated flow of the impounded water upon their land, separate from the damage to the land resulting from the fact it is now subject to overflow when formerly it had substantial protection therefrom, such motion will not be treated as a waiver of plaintiffs' right to urge their claim for all damages resulting from both factors. Unless such motion is presented judgment must be entered for plaintiffs for only nominal damages.

Subsequent to the preparation of the foregoing memorandum the plaintiffs did move to re-open the case for the purpose of offering evidence on the question of what damage resulted from concentration as distinguished from the damage to

the farm from its susceptibility to overflow as in its natural state absent the embankment. That evidence has been received and carefully considered. To a very considerable extent the evidence referred to is directed to an ascertainment of the cost of protecting the farm from *overflow* in its present condition and with the opening in the embankment. It envisages among other things the construction of two levees across the farm to confine the water coming through the new opening in the embankment to a narrow channel across the farm and the cost of such an improvement. The cost of protecting this farm from overflow is not the measure of plaintiffs' damage. As pointed out in the original memorandum, the defendant is under no obligation to protect plaintiffs' farm from overflow from floodwater, hence the cost of doing so is not properly chargeable to defendant.

■■■■■ While the evidence recently offered does not furnish as definite guidance as is desirable on the question of what injury has and will occur from the concentration of the flow of water across plaintiffs' land, it does furnish a basis for a reasonable estimate of that damage. It is unnecessary in proceedings of this character or in Eminent Domain proceedings that the verdict of the jury or the judgment of a court coincide with the figure which some witness has fixed as his estimate of the amount of damage. The judgment of several witnesses concerning the value per acre of the land has been given, the amount of physical injury sustained and estimates of that which is probable in the future from the washing of ditches as a result of the concentrated flow have been furnished. Other information bearing on the question has been made available. From all the evidence a fair and reasonable allowance for all damage incident to the concentrated flow of water upon plaintiffs' land resulting from the opening in the embankment is $1,500. A formal finding to that effect has been made.

■■■■■ One further question has been presented since the case was re-opened. It was not presented originally and is beyond the purview of the order re-opening the case. It is undesirable to ignore it. Plaintiffs now call attention to Section 12572, R.S.Mo.1939, Mo.R.S.A., and contend that it constitutes a proper basis for an allowance to plaintiffs for all of the damages resulting from both overflow and concentration. That statute is as follows: "Whenever a railroad passes over or along land in this state subject to overflow by any river or creek and such land is protected, or may be hereafter protected, by levees constructed to protect such land from overflows and such levees abut on or connect with the right-of-way of the railroad, it is hereby made the duty of any person, persons or corporations owning or operating railroads to continue and maintain the levee from the point where it approaches and abuts on the railroad right-of-way to the railroad embankment and to make the levee connect therewith. And such continuation of levee shall be on a level with the top of the levee of the landowner as it abuts on the railroad right-of-way."

This statute is inapplicable for at least two reasons. First, the railroad embankment was in existence long before plaintiffs' levee was constructed, and when the latter was built it was under a formal written agreement with defendant which fixed the respective rights of the parties irrespective of the statute. That contract permitted defendant under circumstances such as have developed subsequent to the execution of the contract to disconnect the levee from the embankment—and the second reason, simply stated, is that the levee has not been discontinued by the defendant. Whether the statute was intended to apply to a situation such as this need not be considered.