State of Missouri ex rel. Kansas City Power & Light Company, Appellant, v. Nick T. Cave, Samuel A. Dew and James W. Broaddus, Judges of the Kansas City Court of Appeals, and Mollie Barnes Gauld and Alex Gauld, her Husband. Respondents, No. 41772, 230 S. W. (2d) 850.

Court en Banc, June 13, 1950.

796

*Ludwick Graves, Keith P. Bondurant, Alan Wherritt* and *Robert F. Sevier* for appellant.

Robert E. Coleberd and Francis G. Hale for respondents; Lawson, Hale & Coleberd and Arthur R. Kincaid of counsel.

ELLISON, J.—This case was brought here by the plaintiff-appellant Kansas City Power & Light Company on a petition for writ of certiorari directed to the Judges of the Kansas City Court of Appeals for alleged conflict of their decision with decisions of this court. But under our Rule 2.06 the petition will be treated as one to transfer the underlying cause—which was a condemnation suit instituted by appellant in the circuit court of Clay County to condemn a right-of-way for an electric transmission line across a tract of land owned by the defendants-respondents Mollie Barnes Gauld and her husband. In a trial on exceptions filed by both parties to the report of commissioners a jury awarded respondents $2000. And the circuit court's judgment sustaining that award was affirmed by the judges of the Court of Appeals, as reported in 222 SW. (2d) 940.

Appellant's chief contentions are that: (1) certain of respondents' witnesses on land values failed to qualify as experts; (2) the award is based on elements of damage which were remote and speculative and inadmissible in evidence under the decisions of this court, as disclosed on the cross-examination of respondents' witnesses who gave

the testimony, to which testimony appellant's counsel made proper objection at the time; (3) the closing argument of respondents' counsel was inflammatory and prejudicially erroneous.

The underlying facts, in brief, were as follows. The right-of-way condemned was a strip of land 100 feet wide and 1876.8 feet long. The tract from which it was taken contained 60.8 acres. It was farm land most of which was adapted to the production of such crops as corn, small grain and hay. All of it had been cleared of timber and brush except about 12-15 acres. Eighteen acres were hilly and 40-50 acres creek bottom land. It was a tenant farm, the improvements consisting of an old dwelling house, a barn, poultry sheds and a corn crib erected on space not traversed by the transmission line. The transmission line consisted of three wires strung on two 2-pole structures and one 3-pole structure, called towers. It carried 154,000 volts of electricity. The poles were 60 to 90 feet long and set cross-wise on the strip of land 15.5 feet apart with a crossarm, like a letter H. They were spaced at distances of 750 feet with a wire clearance of about 27 feet above the ground. The wires were equipped with circuit breakers so that if they should break the current would be shut off in 1/10 second. The poles, at their bases, interfered to some extent with the planting and plowing of corn at those places.

The condemnation petition and proceedings pursuant thereto reserved to the Power Company the "right * * * to trim, top or remove now and at any future time trees and brush upon said easement or right-of-way, and to trim or top any trees within fifty (50) feet of the said easement or right-of-way; to have ingress and egress over and across said easement or right-of-way and to install gates in all fences crossing the same; and the defendants, their personal representatives, successors, or assigns, shall not construct or maintain upon said easement or right-of-way any building or structure of any kind or character or permit or maintain upon said easement or right-of-way trees, brush, weeds or personal property of any kind and character that might obstruct or become a fire hazard to the lines of the plaintiff; * * *."

Both parties filed exceptions to the report of commissioners, but the defendants assumed the burden of going forward. They presented 10 witnesses familiar with farm land values in the vicinity on the money damage to the 60.8 acre tract resulting from the condemnation. These witnesses variously estimated the original value of the tract at from $200 to $275 per acre, and the damage from the condemnation at $45 to $75 per acre, making the total depreciation range from $2700 to $4500.

In the direct examination of the witnesses, defendants' counsel called their attention to the condemnation plan outlined in the plaintiff's petition and set out in the second and third preceding paragraphs. On that basis the witnesses were asked to express their

views on the money damage to the tract. On cross-examination appellant's counsel interrogated them concerning reasoning and grounds on which they had arrived at the conclusion that the depreciated value of the tract was in the amounts they had severally stated. These questions were asked with a view to determining the admissibility of their testimony in chief on damages, under the decisions of our appellate courts, pro and con, cited below.[1]

Likewise on cross-examination appellant's counsel interrogated respondents' witnesses Davidson and Thompson on their qualifications as experts on valuation and damage. Both said they had never been on the land before the appellant utility had done work on the transmission line. But Davidson said he had passed by the land many times, and had inspected it after the line was completed. Thompson had inspected the land and the line after its completion, but did not say he had ever been on it before the construction work began. But he did testify he had lived in the county at Liberty, the county seat, for 30 years and had been in the real estate brokerage business there for 11 years, and as a licensed real estate broker for 6 years. He further said he was familiar with farm land values in the county and vicinity; and that during the year preceding the condemnation he had farms listed with him for sale of the aggregate value of $500,000; that in 1947 he had made 15 or 16 farm sales in the county; in 1946 about 20 sales; and in 1945 about the same number.

■ Appellant's first contention in its brief is that the trial court should have ruled the testimony last foregoing of these two witnesses was not sufficient to qualify them as experts competent to give opinion testimony on the value of the tract involved and the money damage resulting from the condemnation. It relies on the Creed case, supra,[1] 32 SW. (2d) l. c. 787(5) which stated that such testimony must come from witnesses "who show themselves to be acquainted, both with the property condemned, and the effect of the construction and operation of the public utility upon it." We think the court's ruling should stand. It was largely in the discretion of the trier of the facts, who saw and heard the witness.

In our opinion it was not essential that the two witnesses should have gone on and inspected the land both before and after the condemnation. Witness Davidson had passed *by* the land many times before the condemnation and witness Thompson said farm land in the

[1]Mo. Power & Lt. Co. v. *Creed* (Mo. App.) 32 SW. (2d) 783 (6, 7, 8, 9, 11, 14, 15, 16, 18, 19); Ark.-Mo. Power Co. v. *Killian*, 225 Mo. App. 454, 40 SW. (2d) 730, 732(7); Mo. Power & Light Co. v. *Hancock Mut. Life Ins. Co.* (Mo. App.) 58 SW. (2d) 321, 324(4); Cities Service Gas Co. v. *Peak*, 227 Mo. App. 515, 54 SW. (2d) 482, 484(8), 485(9); Texas Empire Pipe Line Co. v. *Stewart*, 35 SW. (2d) 627, 331 Mo. 525, 531(3), 55 SW. (2d) 283, 285(4). See also Annotations, 49 A. L. R. 702, 124 A. L. R. 413-4, 425; 29 C. J. S. § 154, p. 1013; 20 C. J. § 226, p. 764; 18 Am. Jur. § 267, p. 909; § 292, p. 933.

vicinity had been listed with him, though he had not sold any of it. Both inspected it after the construction of the line and doubtless could ascertain the physical effect of the work upon it. And as brought out by appellant's own counsel, if the witnesses had inspected the land before the condemnation started they would not have known where the transmission line was to be located. See State ex rel. State Highway Com. v. Devenyns (Mo. App.) 179 SW. (2d) 740, 743(4, 5); Lee v. Allen (Mo. App.) 120 SW. (2d) 172, 173, 174(2-5); Funk v. St. L.-S. F. Ry. Co., 225 Mo. App. 347, 355(c), 35 SW. (2d) 977, 987 (6, 7), and the *Peak* case, supra.[1] See also: 22 C. J. § 599, p. 507, § 682, p. 578, § 686, p. 586, pp. 587-591; 32 C. J. S. pp. 299-304, § 454.

Appellant's next contention is that the cross-examination of many of respondents' expert witnesses disclosed they based their estimates of the damage to respondents' tract on facts and contingencies so remote and speculative that they would not support the jury's award, as held in the authorities cited supra.[1] We shall revert to these presently.

Appellant's brief argues that on cross-examination the witness Davidson (who had a similar suit pending) was unable to specify any reason why the construction of the transmission line damaged the tract. And it is true he conceded the tillable land in the tract was in corn; and apparently, that such crops could still be raised after the construction of the line. Neither did he say definitely that the poles in the line would interfere with cultivation of the crops. As nearly as we can interpret the witness' testimony that the damage to the land would be 20% or $45 per acre, he meant that would result from the appellant's perpetual occupancy of the strip condemned, and the consequent interference with respondents' right of free ownership imposed by the restrictive provisions in the condemnation proceedings, as read to him and heretofore set out.

As to the witness Thompson, appellant asserts he also failed to state any basis for his opinion that the tract would be depreciated in value $50 per acre. His cross-examination was limited almost exclusively to how much the seven poles in the two 2-pole structures and the one 3-pole structure would interfere with the cultivation of the corn. He finally admitted this damage would be negligible to the tract *as a farm*. But did not retract his testimony that the money damage would be $50 per acre, though he did not state what would cause it.

Another witness, Williams, thought the damage to the tract would be $50 or $60 per acre. He conceded the diminution in crop production caused by the poles in the transmission line would be slight, though he said a lot of damage might be done by appellant's employees going on the land. But he agreed the appellant would have to compensate respondents for any such damages. Finally he said: "I just considered it would damage me that much [$50 or $60 per acre]

or more if it was on my place, no particular cause whatsoever I guess." Then he admitted his estimate of the damages probably was just an opinion he had, not based on any factual matter at all. Appellant moved to strike out the testimony of the witness and the court said: "I don't think it is based on any factual testimony. It is just a guess," but still refused to strike out the testimony.

Respondents' witness Woods estimated the damage to the land at $50 per acre. He had a similar case pending. He agreed the tillable part of respondents' tract was corn or grain land, but thought the bases of the seven poles in the transmission line would prevent cultivation within 15 feet of each pole, or a total area of less than ½ acre. He admitted that was negligible, but he further said the line would prevent the erection of building improvements close to it; that *he* was *afraid* of the electric line, and that he considered it *unsightly and a hazard*. And he thought purchasers would not pay as much for the tract for those reasons, and because they generally are afraid of easements across land, which cut it into irregular parts and complicate the title. Finally the court struck out all this witness' testimony as to damages on the ground that he had mentioned no factors which were not remote and speculative.

Witness Collison also was a defendant in a similar suit. He thought some damage to the tract would result from interference with the cultivation of the tract around the bases of the transmission line poles; cutting down trees on the 100 foot right-of-way; trimming and topping the trees and cutting brush on the 50 foot strips on both sides of the right-of-way if a fire hazard. He further said he had *heard* the line might break and thought it was unsightly. And he summed up by saying he thought the fact that the transmission line crossed the tract would decrease its value $50 or $60 per acre. As we understand, the court overruled appellant's motion to strike the witness' whole testimony, but sustained it as to the element of the damage.

Witness Ray McCorkle had a similar suit. He thought the whole tract would be damaged $60 per acre by the construction of the transmission line across it. He would not itemize the factors that he considered caused the damage. No motion was made to strike out his testimony.

Witness Nutter had a similar suit. He thought the damage to the whole tract would be $75 per acre. On cross-examination he said in arriving at that figure he took into consideration five factors: (1) appellant's trucks might cross the uncondemned land and damage growing crops thereon; (2) interference of the poles in the line with the cultivation of crops on the condemned strip; (3) the existing easement would be a "draw-back" in case of a sale of the tract; (4) the "looks" of the transmission line across the tract would be detrimental to its value; (5) and the transmission line might break.

All this witness' testimony on the question of the value of the land before and after the condemnation—in other words, the damages—was stricken out by the court on appellant's motion.

Witness Scott had a similar case pending. He said he thought the taking of the strip of land under the conditions imposed by the condemnation proceedings would damage the tract $50 to $75 per acre. On cross-examination he said he did not, in arriving at that conclusion, consider how much land would be taken out of cultivation by the transmission line; and that his estimate was based on its mere permanent extension across the tract.

Witness Berry had a similar case pending. He estimated the damage to respondents' tract would be $60 per acre. On cross-examination he said he based his estimate on the fact that the transmission line would cut the tract in two, and would prevent the construction of buildings on the easement.

The defendant husband, Alexander Gauld thought the whole tract was damaged $50 or $60 per acre. It was rented on a 50% crop basis, the corn yield being 2000 bushels an average year, and 875 bushels the preceding year. His half of the clover hay the preceding year was about 30 tons. He was not cross-examined on the elements of damage entering into his calculations.

In this case, the defendant-respondent landowners assumed the burden of going forward and proving their damage, which was proper since they were in the position of plaintiffs on that issue. K. C. & G. Ry. Co. v. Hooke, 331 Mo. 429, 437(5), 53 SW. (2d) 891, 895(7), 84 A. L. R. 1477, 1484. As their several witnesses on that issue were produced, they first made a showing of the witnesses' acquaintance with the tract involved and similar land in the county and vicinity, and their knowledge of land values there; after which the witnesses gave their opinion on the value of the particular tract before and after the condemnation.

Counsel for plaintiff-appellant then took the witnesses on cross-examination and interrogated them in detail concerning their familiarity with the tract and other like farm land, and the particular reasons for their opinion on the money damages. Appellant contends on this appeal that the answers of the witnesses, or many of them, disclosed the elements of damage underlying their opinions were remote, speculative and inadmissible. On that point they invoke the decisions cited supra.[1]

Of these the *Creed* case held that proof of anticipated damages caused by the condemnor's employees going through the landowner's premises and (1) bringing dogs, or (2) spreading disease among livestock, or (3) leaving gates open or fences down, or damaging pastures—all these damages, the decision held, would be in the nature of torts compensable by the condemnor in a separate action, and remote, conjectural and inadmissible in the condemnation suit. The

decision further held (4) testimony that the electric wires *might* break and become dangerous was purely speculative and valueless where the undisputed testimony showed, as here, that the wires were equipped with circuit breakers which would automatically cut off the current if the wires broke. But the Creed decision held evidence was competent that strange employees of the condemnor coming on the land to patrol the transmission ▆▆▆▆ line would frighten cattle and thereby damage them.

The *Killian* case, supra,[1] took the same negative view as the Creed case with respect to the danger from the electric wires. And the *Hancock* case, supra, followed and extended the ruling in the *Creed* case, supra, making it further include as incompetent the individual opinion of a lay witness that the towers supporting the line might be blown or fall over and injure persons; and also that the transmission line was unsightly; and that the witness simply would not want the line on his land.

The decisions relied on by respondents' counsel are the *Peak* case and the *Stewart* case, supra.[1] The Peak case simply held that a competent witness on land valuation and damage may give his opinion on those questions on direct examination, without stating in advance all the elements he regards as supporting his opinion. But these may be inquired into by the opposing party on cross-examination.

In the *Stewart* case, decided by this court en banc, witnesses for the defendant in a condemnation suit had given their opinions on the market value of his farm before and after appropriation therefrom of a pipe line right-of-way. On cross-examination the same witnesses stated their opinions as to the separate different causes of the money depreciation but could not state the contributing effect of each. Some, but not all the separate causes thus stated were remote and speculative. At the *close* of the whole cross-examination plaintiff moved that *all* the testimony of these witnesses be stricken, and the trial court refused to do so. This court upheld that ruling, saying the incompetency of part of the testimony of the witnesses not objected to separately did not destroy their whole testimony, but merely tended to discredit the witnesses' opinions on the depreciation.

This Stewart case was considered and distinguished by the St. Louis Court of Appeals in the later *Hancock* decision supra, which pointed out that in the Stewart case the plaintiff had waited until the end of its whole cross-examination and then moved to strike *all* the testimony of defendant's witness on the causes of depreciation, although part of it was admissible and valid, whereas in the Hancock case counsel for the plaintiff utility made timely objection separately to each asserted element of damage. That was done here also, and in many instances the trial court sustained the objection and struck

out the testimony as to damages.  We think the present appellant's contention is sound in part.

In our opinion the testimony of the witnesses Davidson and Thompson was not destroyed by cross-examination, and there was no motion to strike it out.  Witness Williams said he could not ascribe "any particular cause whatsoever" for his estimate of damages and that it "probably was just an opinion not based on any factual matter at all."  We think the court erred in not striking out his testimony on the amount of damages.  The court did strike out the testimony of witnesses Woods, Collison and Nutter as to damages.  In most instances, however, this was not done promptly, but only after repeated cross-examination.  No motion was made to strike out the testimony of witnesses McCorkle, Scott and Berry.

On appellant's third assignment, that the closing argument of respondents' counsel Hale was inflammatory and prejudicially erroneous.  Twice during the direct or redirect examination of respondents' witnesses Thompson and Williams, respondents' counsel asked them if they had "any information" or "way of knowing" whether the appellant utility, after the lawsuit was over, would *permit* respondents to farm the right-of-way under the transmission line, or "whether that right would continue."  The court sustained an objection to the question both times, and said it did not understand it was in the case.  And respondents made no effort to have the court construe the condemnation petition to determine whether cultivated crops on the right-of-way would constitute a "fire hazard" or "obstruction", in which event alone the utility could interfere on any theory.  And as a matter of fact there was a corn crop on the right-of-way when the case was being tried, or shortly before, as the photographs showed.

Nevertheless, during his closing argument counsel made this statement:  "They say now that they can farm under that, grow stuff and all that.  There is nothing in the petition about it and I will warrant you they will permit that, they will permit that until these law suits are finished, *I don't know what they will do then.*"

Further in closing argument counsel said:  "This is the only chance they ever have to be compensated for their damages.  If you jurors return a verdict that is lower than they are justly entitled to, there is no power on earth that can rectify it.  They will never have a chance to be compensated for the damage."  A similar statement in an instruction was condemned in the Creed case [32 SW. (2d) l. c. 788(20)] on the theory that it was misleading and might be construed by the jury to mean that the landowner never could recover again not only damages for the taking and depreciation of his land, but also other damages, such as for torts committed on or in connection with the easement.

And finally counsel further said in closing argument: "This 154,000 volt transmission line may be perfectly safe, I don't know. It may not affect the market value of the land, but I will tell you one thing, if I had a caged rattlesnake in my bedroom that probably would never get out—* * * I wouldn't rest so well even though somebody had told me that snake was equipped with a gadget that would lock his jaws in one tenth of a second after he got out of that cage. I'd sell out pretty cheap. It would lower the market value of my room.".

This was highly inflammatory. The Creed, Killian and Hancock cases, supra,[1] all held testimony (and therefore argument) that the electric wires might break and injure or kill persons or livestock was purely speculative where the evidence showed, as here, that the transmission line was equipped with circuit breakers, and there was no expert testimony to the contrary.

Because of the foregoing erroneous argument and the failure to strike the opinion testimony of the witness Williams which he, himself, declared and the court found, was just a guess and not based on any factual testimony, the judgment is reversed and the cause remanded for a new trial. All concur.